## Commonwealth ex rel. Hubbell *v.* Hubbell, Appellant.

Argued March 24, 1954. Before Ross, Gunther, Wright, Woodside and Ervin, JJ. (Rhodes, P. J. and Hirt, J., absent).

The facts are stated in the opinion, by Bretherick, J., of the court below, as follows:

This is a habeas corpus proceeding instituted by the father, relator, to obtain custody from the mother, respondent, of Barbara Ann Hubbell and Marcia Lynn Hubbell, age five and two and one-half years, respectively, two of the three children of the parties. The custody of the third child, Deborah Jane Hubbell, age about one year, is not involved in this proceeding.

The facts and circumstances forming the background of this case reflect little credit on either the relator or the respondent. The parties were married in 1944, and, apparently, there were difficulties between them almost from the beginning. However, the events which finally led up to this proceeding had their beginning in the fall of 1951, when respondent became employed at the Black Horse Tavern, near Media, a restaurant and taproom operated by William Stone. The parties were residing at that time in the City of Chester. Respondent testified that relator was unemployed at the time, and that she went to work at his instigation and urging.

In the course of time, an undue intimacy sprang up between respondent and Stone. Relator and respondent grew further and further apart. Reverend

Kish, the pastor of their church, made several attempts, without success, to effect a reconciliation. The parties finally separated in August of 1952. At the time of the separation, respondent admitted to relator that she had had illicit relations with Stone over the course of several months. And, according to respondent's uncontradicted testimony, relator admitted to her that he had had several "affairs" with other women. Respondent testified, "After we broke up, we both had a discussion about our extra-curricular affairs; he discussed it with me and I discussed it with him."

Meanwhile, Mr. Stone and his second wife were having troubles of their own. It is a fair inference from the testimony that the root of their difficulty was Mr. Stone's infatuation with respondent. The Stone marriage was finally dissolved by a decree of divorce obtained, as we understand it, at the suit of Mrs. Stone.

The parties to the within proceeding, as already noted, separated in August of 1952. For some time after the separation, respondent continued to live in Chester with the three children, and relator made some financial contributions toward the support of the children. Relator, admittedly, stopped making these payments in October of 1952, and thereafter respondent supported herself and the children out of her earnings at the Black Horse Tavern. On February 18, 1953, respondent took the three children and went to live in Stone's apartment above the tavern. She testified that she was forced into this move because of financial difficulties due to relator's refusal to give her any money for the children. On his part, relator testified that respondent told him that she didn't need his money.

In the meantime, respondent had started divorce proceedings against her husband, and a final decree was entered in the action on March 16, 1953. On March 23, 1953, after the institution of this habeas corpus

proceeding, respondent married Stone. Since the marriage, she has continued to live in the apartment above the tavern with her three children and her present husband.

Relator now resides with his mother and his stepfather, Rev. Parry, in St. Petersburg, Florida. It is relator's intention, in the event he is awarded custody, to take the two oldest children to Florida. He is not seeking the custody of the youngest child because of respondent's admitted misconduct with Stone prior to the child's birth.

In all cases involving the custody of a child, the governing criterion is the welfare and interest of the child. *Hixon's Appeal,* 145 Pa. Superior Ct. 33; *Com. ex rel. Goldbaum v. Goldbaum,* 161 Pa. Superior Ct. 131. "The cardinal consideration is ever the welfare of the child, which includes its physical, intellectual, moral and spiritual well being. To this the rights of parents and all other considerations are subordinate": *Com. ex rel. v. Daven,* 298 Pa. 416, 419. Where the dispute is between the father and the mother, the fitness of such parent to have custody of the child or children is to be considered as well as the best interest and permanent welfare of the child or children. Act of June 26, 1895, P. L. 316, §2, 48 PS §92. As stated by the Superior Court in *Com. ex rel. Martocello v. Martocello,* 148 Pa. Superior Ct. 562, at page 563: "In cases of this kind, what is in the best interest of the child and his permanent welfare is to be decided, not in relation to a fixed standard, but by determining what is best for the child under all of the circumstances."

In general, the needs of a child of tender years are best served by its mother, and, unless compelling reasons appear to the contrary, such child should be committed to the care and custody of its mother. *Com. ex rel. Gates v. Gates,* 161 Pa. Superior Ct. 423; *Com. ex*

*rel. Lamberson v. Batyko et al.,* 157 Pa. Superior Ct. 389, 391; *Com. ex rel. Minnick v. Wilson et ux.,* 159 Pa. Superior Ct. 230, 232. Lapse from moral standards has been held not controlling in determining the question of custody of a child of tender years where the parent is not otherwise at fault. *Com. ex rel. Bock v. Bock,* 159 Pa. Superior Ct. 159, 162.

A mother's right to care and custody is not absolute; it must yield to the best interest and welfare of the child. *Latney's Appeal,* 146 Pa. Superior Ct. 20, 22; *Com. ex rel. Swartzwelder v. Swartzwelder,* 162 Pa. Superior Ct. 366, 369. "It is only where no reason appears to the contrary that the mother is entitled to an award of children of tender years": *Com. ex rel. Pescatore v. Pescatore,* 158 Pa. Superior Ct. 349.

We are of opinion, after the most serious consideration, that the best interest and permanent welfare of these children would be secured by awarding their custody to the relator. It may well be that, in the mother's present circumstances, the question of her moral fitness is not determinative of the issue. Indeed, as to individual fitness, there may be no substantial basis for choosing between the parties. We are convinced, however, that the children's present environment is not conducive to their proper training and upbringing.

The Black Horse Tavern is situated on the Baltimore Pike, a mile or so west of the Borough of Media. It is a one-story structure for the most part, with living quarters at one end of the building, immediately above the dining room. There is an outside entrance to the apartment, and a stairway also leads up to it from the dining room. The space in front of the building is used for the parking of the patrons' automobiles.

The tavern does a typical taproom and restaurant business, and seems to enjoy a flourishing trade. The hours of business are until two o'clock in the morning

through the week, and until midnight on Saturdays. A three-piece band entertains patrons on Saturday evenings until closing time. There is also the inevitable juke box available for use at all times during business hours.

While the home is adequately furnished and contains the usual conveniences, its intimate connection with the tavern is bound to expose the children to conditions which cannot be otherwise than detrimental to their physical, intellectual, moral and spiritual wellbeing. It is not a question of the legality of the business, as respondent seems to argue. It is simply a matter of common knowledge that the presence of children in or around taprooms subjects them to influences inimical to their normal and spiritual development. Considering the question of their physical welfare alone, it is difficult to see how these children can obtain their proper sleep and repose, what with the blare of bands and juke boxes far into the night, the noise of automobiles starting and stopping and the sounds emitted by patrons in moments of relaxation or exhilaration,—all these within a few feet of their bedroom.

We are not convinced, either, that respondent is in a position to give to the children the care and attention which their tender age requires. She states that she works in the tavern three nights a week, but not until after nine o'clock. During these periods, the children are upstairs alone. Although respondent says that she checks up on them every hour, such an arrangement impresses us as being decidedly unsatisfactory.

It is of importance, too, that this home may lack the desirable quality of continuity and stability. Respondent is Stone's third wife. As we read the testimony, he is the father of four children by his first wife, and two by his second wife. Throughout the testimony

runs the suggestion that the children's present home may be a precarious one.

The testimony persuades us that the welfare and interest of the children will be best served in the home offered by relator. The home is situated in a residential section of St. Petersburg, Florida, and appears to be satisfactory in every way. It is in close proximity to schools and churches. The household, besides relator, includes relator's mother, her husband, Rev. Parry, and Nancy M. Bentley, aged twenty-six years, who was raised by Mrs. Parry.

Relator's mother and stepfather are willing and anxious to receive the children into their home. Rev. Parry is now retired. Mrs. Parry is fifty-five years of age, and enjoys good health. She is executive financial secretary of a research foundation, and earns about $91.00 a week. She works only in the morning, and would be home with the children for the remainder of the day. During the period of relator's unemployment, his mother will assume responsibility for the children's financial needs.

It is relator's intention that the older child shall attend a church school in St. Petersburg. The younger child will be cared for, while Mrs. Parry is at work, either by Mr. Parry or by a very close friend who lives nearby.

We recognize, of course, that only unusual circumstances can justify the placing of a child beyond the jurisdiction of the court. *Com. ex rel. Fortunes v. Manos*, 140 Pa. Superior Ct. 352, 354; *Com. ex rel. Balla v. Wreski*, 165 Pa. Superior Ct. 6, 9. In our opinion, however, the facts before us require the award of the custody of the children to the relator. Respondent, of course, must be afforded an opportunity to see her children. It is against public policy to destroy or limit the relation of parent and child. *Com. ex rel.*

*Fortunes v. Manos,* 140 Pa. Superior Ct. 352, 355. We think respondent should be permitted to have the children for one month each summer, provided that she maintains them at a suitable place other than the Black Horse Tavern, and that relator should be required to arrange for the children's transportation to and from Pennsylvania at his own expense. Relator should also be required to file a compliance bond.

*Edward M. Seletz,* for appellant.

*Louis A. Bloom,* for appellee.

OPINION BY WOODSIDE, J., August 7, 1954:

This appeal involves divorced parents, each desiring custody of two of their children. In such cases there usually is no solution to the problem; the court can only choose between unsatisfactory situations. So is it here.

The burden is on the appellant to establish that the order of the lower court is erroneous or based on a mistake of law: *Com. ex rel. Heller v. Yellin,* 174 Pa. Superior Ct. 292, 297, 101 A. 2d 452 (1953).

Any experienced trial judge, while conducting a hearing which involves the custody of children, is observing every act of the parties, not only to appraise the truth of their testimony, but also to evaluate their fitness to have custody of the children. An appellate court lacks this opportunity to pass upon the ability and character of the parties.

Judge BRETHERICK is an experienced and able member of a trial court whose sympathy for children and interest in their welfare has often been demonstrated. His opinion sets forth the facts and the reasons for the court's conclusion.

The appellant has not satisfied the majority of this court that the order of the lower court is erroneous or based on a mistake or law. We therefore affirm the order on the opinion of Judge Bretherick.

DISSENTING OPINION BY WRIGHT, J.:

Of course I agree that Judge Bretherick "is an experienced and able member of a trial court whose sympathy for children and interest in their welfare has often been demonstrated". However, appeals to the Superior Court in proceedings for the custody of children are governed by the Act of July 11, 1917, P. L. 817, section 1, 12 PS 1874, which provides that we "shall consider the testimony and make such order upon the merits of the case, either in affirmance, reversal, or modification of the order appealed from, as to right and justice shall belong". While this broad power of review does not empower us to nullify the fact-finding function of the hearing judge, *Commonwealth ex rel. Harry v. Eastridge,* 374 Pa. 172, 97 A. 2d 350, it clearly indicates the intention of the legislature that we do more than merely place a rubber stamp of approval upon the action of the trial court. In the words of Judge (later President Judge) Baldrige in *Commonwealth ex rel. Piper v. Edberg,* 150 Pa. Superior Ct. 378, 28 A. 2d 460, "We have given great weight to what has been said by the learned court below, but the ultimate responsibility rests with us to determine from all the evidence who should have the care and custody of the child". And see *Commonwealth ex rel. Kreiling v. Kreiling,* 156 Pa. Superior Ct. 526, 40 A. 2d 704.

The governing criterion in proceedings of this nature is the welfare of the children involved: *Commonwealth ex rel. Haller v. Hanna,* 168 Pa. Superior Ct. 217, 77 A. 2d 750; *Commonwealth ex rel. Donie v. Ferree,* 175 Pa. Superior Ct. 586, 106 A. 2d 681. We have

consistently held that the needs of children of tender years are best served by their mother: *Commonwealth ex rel. Gates v. Gates,* 161 Pa. Superior Ct. 423, 55 A. 2d 562; *Commonwealth ex rel. Schofield v. Schofield,* 173 Pa. Superior Ct. 631, 98 A. 2d 437. Considered in the light of these tests, the order of the lower court is palpably erroneous and should be reversed.

Dorothy A. Hubbell, appellant, is the mother of three little girls now aged respectively, six, four, and two years. These children have resided with their mother continuously since birth. There is not one scintilla of testimony in the record that the mother does not give them proper care. The fact that the mother associated with her present husband prior to divorcing the relator[1] is not controlling: *Commonwealth ex rel. Bock v. Bock,* 159 Pa. Superior Ct. 159, 48 A. 2d 133. The evidence clearly establishes that she is thoroughly devoted, affectionate, and capable. The children are well fed, well clothed, and in excellent physical condition. The hearing judge commented that the three children appeared to be well cared for. Nevertheless, he awards custody of two of them to an unfit father who is emotionally unstable, subject to spells of violence, addicted to the excessive use of alcohol, fails to pay his debts, and is presently unemployed. The father did not contribute any support for almost two years, evidenced no paternal interest whatsoever, and in effect abandoned the children. See *Clark Adoption Case,* 175 Pa. Superior Ct. 68, 103 A. 2d 470.

The reasoning of the lower court is based largely upon the fact that the children must live in an apartment above a taproom operated by their mother's present husband. But this court certainly cannot say that a mother should lose her children because she marries

---

[1] According to the testimony, relator was at least equally guilty.

the proprietor of a taproom. The apartment in question is modern in every way and has a separate entrance from outside the building. It is harmful to remove children summarily and permanently from agreeable surroundings and associations incident to the only parental control and supervision they have ever known: *Davies Adoption Case*, 353 Pa. 579, 46 A. 2d 252. The suggestion in the opinion of the lower court that "this home may lack the desirable characteristic of continuity and stability" is unfair speculation not supported by the testimony. Nor is it consistent to separate the children and thus effectively destroy their relationship as sisters growing up together. See *Commonwealth ex rel. Reese v. Mellors*, 152 Pa. Superior Ct. 596, 33 A. 2d 516.

Finally, relator is actually not seeking custody for himself. The children are to live in the home of relator's mother and step-father in St. Petersburg, Florida. The bedrooms in this home are already occupied and the children would have to sleep with a Miss Bently. The relator's mother is regularly employed. She and her husband are strangers to the children. No independent investigation was made of their home or of their financial ability. The conclusion of the lower court is based in part upon statements made by relator's mother not of record, and considered by the court in violation of our admonition in *Commonwealth ex rel. Oncay v. Oncay*, 153 Pa. Superior Ct. 569, 34 A. 2d 839; and *Commonwealth ex rel. Balick v. Balick*, 172 Pa. Superior Ct. 196, 92 A. 2d 703. This circumstance in itself requires a reversal.

GUNTHER, J. joins in this dissent.