## Nangle Petition.

Argued November 10, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and GUNTHER, JJ. (ARNOLD, J., absent).

*Clyde Holt, Jr.,* with him *Holt, West & Holt,* for appellants.

*Thompson Bradshaw,* with him *Bradshaw & Panner,* for appellee.

OPINION BY ROSS, J., January 20, 1953:

The contest for custody of the 13-month-old child involved in this habeas corpus proceeding is between

his father and foster parents. The court below awarded custody to the father and the respondent foster parents have appealed to this Court.

We have here a repetition of the all-too-familiar story of the parent who, on the death of his spouse, has no suitable home to which to take his young child and no one to care for it, so entrusts it to strangers until such time as he shall be able to provide it with a home and proper care. The foster parents cherish the child as their own and when the parent has made the necessary arrangements and is ready to receive it back, they have become so attached to it by bonds of affection that they resist his efforts to take it from them, even to the extent of grasping at straws, if necessary, in defense.

Relator Robert L. Nangle and his wife, in March 1951, held a ten-month lease on a home in New Brighton, Beaver County. The owners of the home were in Florida and were about to return. Shortly before the lease expired relator's wife was taken to a Pittsburgh hospital for special maternity treatment. On March 21, 1951, a few hours after delivery of the child here involved, Danny Martin Nangle, his mother died. Relator's own mother had died during his infancy and he, with his two sisters, had been reared by an aunt and uncle in Washington, Pennsylvania. He could not turn to the elderly couple for help when his wife died because the aunt was critically ill and died two months later. One of his sisters, Miss Edna Nangle, who lived with them, was occupied with the responsibility of caring for the aunt in her last illness. His other sister, Mrs. Dorothy McMann, a widow, lived and was employed as hostess in a hotel dining room in Steubenville, Ohio. Relator was employed as a watch repairman in a jewelry store in Beaver Falls. Mrs. McMann was willing to help her brother but at

the time he had no living quarters available for her, himself and the baby to occupy in Beaver Falls, had she abandoned her employment in Steubenville and come there.

Through a co-worker in the jewelry store relator learned that respondents might be willing to take the child temporarily and he contacted Mrs. Yoho who, on March 30, 1951, came to the store to discuss the matter with him and he later went to respondents' home, the end result of which negotiations was an agreement that respondents would care for the child. On April 1, 1951, respondents and relator drove to the Pittsburgh hospital for the baby, returning via Washington in order to have relator's relatives see the baby. Relator visited the Yoho home on several occasions, as did his sisters, and left money for his son's maintenance, concerning which no definite agreement was in existence. On October 14, 1951, the occasion of relator's last visit, the parties had the child baptized.

Relator lived for a time in a room in a private home and following unsuccessful efforts to obtain a housekeeper for the house he had procured in Beaver Falls, he obtained employment in Steubenville and moved into his sister's apartment there, advising respondents, by letter of January 25, 1952, of his change of residence. Included in the letter, which was admitted in evidence, was an expression of his hope to establish a home for his young son and for his six-year-old step-daughter, who was being maintained by her maternal grandparents in Washington, and a request that respondents set the amount of maintenance they desired of him. Respondents did not reply.

Mrs. McMann in the meantime arranged to have her mother-in-law, a Mrs. Kochendarfer, move into the apartment to take care of the child during intervals when relator and she were at work. Having thus com-

pleted arrangements, relator, on April 15, 1952, addressed a letter to the wife respondent, advising that he was coming for Danny on April 19. Respondents, through their attorney, replied that they would refuse him permission to do so, whereupon he petitioned for the writ of habeas corpus on April 24, 1952.

The paramount consideration in cases of this nature is at all times the welfare of the child, which includes its physical, intellectual, moral and spiritual well-being, and all other considerations are subordinate. *Com. ex rel. Graham v. Graham*, 367 Pa. 553, 80 A. 2d 829; *Com. ex rel. Buncher v. Barr*, 169 Pa. Superior Ct. 45, 82 A. 2d 79. Appellants concededly were kind and competent parents, attentive to the needs of the child. They have no children of their own but have adopted a little girl, seven years old. However, "Because he is obligated by law to maintain and educate his children, a parent has the legal right to the custody of his child. This right is not absolute, but still it is so moving and cogent that it is forfeitable only by misconduct or by other factors which substantially affect the child's welfare. Com. ex rel. Fell v. Brown, 100 Pa. Superior Ct. 353. Experience has shown that generally a child's welfare is best promoted by entrusting its future to its parents. This experience is the basis for the principle that prima facie the parent is entitled to custody, and from this rule we depart only when we are constrained by the most compelling reasons. Com. ex rel. Keenan v. Thomas, 151 Pa. Superior Ct. 131, 30 A. 2d 246." *Com. ex rel. McTighe v. Lindsay*, 156 Pa. Superior Ct. 560, 562, 40 A. 2d 881. See also *Com. ex rel. McDonald v. Smith*, 170 Pa. Superior Ct. 254, 85 A. 2d 686.

The issue, then, is whether there are, under the evidence of this case, "compelling reasons" which constrain us to deviate from the general rule and award

the custody of this child to those who are strangers to its blood rather than to its natural father.

Appellants urge upon us that appellee is "unstable" because he has changed positions and moved several times. We do not think so. The record shows that he tried to establish a home in Beaver Falls with a housekeeper to take care of the child but was unsuccessful and moved to Steubenville only so that he, his sister and her mother-in-law might jointly make a home for the boy. Nor are we at all favorably impressed with the demeanor of the former employer, E. H. Schaefer, on the witness stand. He seemed to have been motivated more by a desire to avenge the separation of relator from his employment with him than with a genuine desire to tell the truth, as evidenced by the fact that he repeatedly insisted that he had discharged relator and then produced a written record of the latter's employment which flatly contradicted his oral testimony in that it showed relator "quit". Appellants point also to relator's association with a young woman since the death of his wife, but fail to show any impropriety or immorality.

The record is devoid of evidence of abandonment. Relator testified that he discontinued his visits to respondents' home after October 1951 because he would feel depressed at leaving the home without taking the child with him, and resolved to have a home in readiness for him before making another visit. He testified that he told Mr. Yoho that he "didn't want to hear of adoption" and "wasn't going to let the baby be adopted".

Relator and Mrs. McMann plan to continue their search for a suitable house in Steubenville and will then move out of the apartment into it. Rev. Regis Stafford characterized Mrs. McMann's apartment as "a high class city apartment" and expressed the opin-

ion that "she would provide a fine home for the child". He was corroborated by the witness Jerry Ryan, who testified that the apartment was very nicely furnished and in a good neighborhood.

The learned court below, in its opinion, characterized appellants as "fine people" and offered to assist them in having another child placed with them for adoption. They admittedly have a nice home, but the fact that they possibly are able to furnish the child with more luxurious physical surroundings than his father is presently able to afford is not a "compelling reason" to deprive the parent of his custody. Cf. *Com. ex rel. Crilley v. Laird,* 160 Pa. Superior Ct. 132, 50 A. 2d 542.

The fact that relator may take the child from Pennsylvania to his home in another state to care for him there is not controlling. *Com. ex rel. Black v. Black,* 79 Pa. Superior Ct. 409; *Com. ex rel. Cooper v. Cooper,* 167 Pa. Superior Ct. 492, 75 A. 2d 609.

In cases involving the custody of a minor it is the appellate court's duty to examine all the evidence and reach an independent conclusion (*Com. ex rel. Children's Aid Society, Guardian, v. Gard,* 362 Pa. 85, 66 A. 2d 300; *Com. ex rel. Chumard v. Chumard,* 168 Pa. Superior Ct. 188, 77 A. 2d 660), and from our independent examination of the record in this case we find that the father has not in any sense forfeited his right to the custody of his son, and that there are no "compelling reasons" pointing to an opposite conclusion.

The burden was on appellants to establish that the order of the court below was, under the evidence, manifestly erroneous or based on a mistake of law. *Com. ex rel. Williams v. Price,* 167 Pa. Superior Ct. 57, 74 A. 2d 668. They have failed to sustain that burden of proof.

Order affirmed.