Commonwealth ex rel. Shamenek, Appellant, *v.* Allen.

Argued April 19, 1955. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

*Richard W. Cleckner,* with him *Joseph Nissley* and *Livengood & Nissley,* for appellant.

*I. Emanuel Meyers,* with him *Benjamin L. Levi* and *Hurwitz, Klein, Meyers & Benjamin,* for appellees.

OPINION BY ERVIN, J., July 21, 1955:

This is a habeas corpus proceeding in which the father (relator) seeks the custody of his 12-year old daughter, Joanne Shamenek, from Charles Allen and his wife, Evelyn Allen, Joanne's maternal aunt (respondents). The lower court awarded custody to the respondents with visitation rights to the relator.

The relator, who is now approximately 46 years of age, and Anna May Monismith were married in Harrisburg, Pennsylvania, on December 6, 1941. Shortly thereafter they went to Bethlehem, Pennsylvania, to

live, where the relator was then and still is employed by the Bethlehem Steel Company. His annual income is now approximately $4,000.00. Their only child, Joanne, was born March 18, 1943. Differences developed between the parents and they separated for several months in 1947, the mother taking Joanne to live with her in or near Harrisburg with certain members of her family. The final separation occurred in July 1950, the mother taking Joanne to live with her in an apartment in Allentown, Pennsylvania. The relator, after the separation, lived with his sister, Mrs. Carlton Kresge, in Bethlehem. In September 1950 the relator brought a habeas corpus action against his wife in the Court of Common Pleas of Lehigh County to obtain the custody of Joanne. After a hearing held thereon a stipulation was entered into between the parties, approved by the court on October 24, 1950, whereunder Joanne's custody was given to her mother with visitation rights to the relator. At this time, when the child was approximately seven and one-half years old, she had already developed an antipathy toward her father, because when he approached her during a recess in the hearing and started to take hold of her "she screamed and got white as a sheet." The relator exercised his rights of visitation until June 1953 when Joanne refused to accompany her father when he came to his wife's home for her. For some time prior to June 1953 the child did not wish to see the relator and unwillingly went with him only because her mother told her she should go. The mother instituted a divorce action against the relator in the Court of Common Pleas of Lehigh County and at the first hearing held on July 1, 1953 the mother testified in chief but the hearing terminated before her cross-examination had been completed. At this hearing the mother testified that the relator was suspicious of her conduct

with other men, falsely accused her of infidelity, used physical violence toward her, at times in the presence of Joanne, and also threatened to kill her. When confronted with these accusations in the present habeas corpus proceeding, the relator denied the accusations except that he did admit having a little squabble with his wife in 1944, at which time he told her "if she ever took the child [Joanne] from me I would kill her." On August 1, 1953 the mother flew to Winter Haven, Fla. for a rest, suffered a heart attack upon arrival and died. On August 2, 1953 Joanne was taken to the home of the respondents at 718 South 25th Street, Harrisburg, at her own request and she has lived with them ever since. On August 3, 1953 the relator came to the respondents' home to get his daughter. Joanne ran upstairs, then came down crying and trembling and refused to go with her father. The relator then instituted this habeas corpus proceeding in the Court of Common Pleas of Dauphin County.

The relator has not remarried. He is now living with his sister, Mrs. Kresge, and her husband and their two children—boys 12 and 8 years of age—at 634 High Street in Bethlehem. This is an adequate home and the one to which Joanne would be taken if the relator is awarded custody. On the other hand, the Allens own a modern home consisting of six rooms and bath with a playroom in the basement, situate in a good residential neighborhood, on a corner lot 50 x 150 feet. The household consists of Mr. and Mrs. Allen, respectively 42 and 40 years of age, and a son, Charles, Jr., 7 years of age. Mr. Allen is employed by the Boyertown Casket Company as an engraver and order clerk at an annual salary of approximately $3,800.00. His wife, who is not employed, devotes her time to the two children and to her household duties. In this home Joanne has play quarters and a private bedroom.

Joanne now attends the Marshall School, a new modern grade school, where she is making excellent marks. She is proficient in art and each Saturday morning attends a private art class. She regularly attends church services, Sunday School and a Bible study class. She belongs to the Girl Scouts, is president of a girls' club and has acquired many friends in this community. The lower court found that "Her schedule of activities since living with the Allens portrays a most happy, bright, vivacious young girl, whose physical, moral, mental, and spiritual well-being are now, and in the future will be, furthered most admirably in her present environment."

The relator is of the Catholic faith, his wife was of the Lutheran faith. While the parties lived together, Joanne attended a parochial school, one year in kindergarten and one year in the first grade. After the final separation in July 1950, the mother reared Joanne in her faith and sent the child to the Allentown public school where, prior to her mother's death, she completed her second, third and fourth grades. While attending the Allentown public school Joanne, who has an unusually high intelligence quotient, was advanced two grades beyond her normal placement and passed her fourth grade "in this opportunity class." The lower court found that Joanne "is well-adjusted emotionally, and that her refusal to live with her father and the Kresges is predicated, not on an immature childish impulse, or on pressure applied by the Allens, but solely on a deeply rooted and fixed feeling against her father, caused, as she said, by reason of his treatment of her mother, to whom she was devoted and whom she loved." Joanne testified that she loves the Allens, who are like a father and mother to her and wants to live with them rather than with her own father and the Kresges. The Allens have supported Joanne since she came with

them without any assistance from the father. She wants to continue to attend the Marshall School rather than a parochial school and the Lutheran Church in Harrisburg, which she likes better than any other church she has ever attended and she wants to remain with the many friends she has made in Harrisburg.

The lower court, in its opinion, stated: "However, when Joanne was asked how she felt toward her father and how he treated her mother, she became pale, her face flushed, she trembled, started to cry, stated she felt ill, often did not answer the questions, and pleaded to be dismissed from the witness stand. This because, as she said, she did not want to talk about the bad things that happened between her parents. . . . The record discloses that these reactions occurred on numerous occasions, and that at times her weeping was protracted. Joanne's aforesaid reactions disclose her extreme antipathy toward her father more effectively than words."

The third and final hearing in the instant action was held March 9, 1954. At the conclusion thereof it was stipulated by counsel, with the approval of the court, that until the final determination of the case the relator should have the right of visitation to take Joanne anywhere in Dauphin County on each Saturday from 1:00 p.m. to 8:00 p.m. and on Sunday from 2:00 p.m. to 4:30 p.m. The final order was not made until January 31, 1955. In its opinion the lower court stated: "The Court purposely delayed making any final order, in the hope that Joanne might become reconciled to her father and willingly consent to live with him. However, after talking privately with Joanne, with the approval of counsel, several days prior to the writing of this opinion, unfortunately we found that our hopes were not realized. The child's antipathy toward her father had increased and her fixed desire to live with

the Allens and to remain in her present environment was stronger than ever." In the final order custody was awarded to the Allens with the right of the relator to have temporary custody for a period of two consecutive weeks each year during the month of July or August and the relator was given visitation rights on Saturday of each week from 1:00 p.m. to 8:00 p.m.

This is an exceptionally difficult case for decision. On appeal we are obliged to "consider the testimony and make such order upon the merits of the case, either in affirmance, reversal or modification of the order appealed from, as to right and justice shall belong." Act of July 11, 1917, P. L. 817, §1, 12 PS §1874. The general rule is that the father is entitled to the custody of his infant children. *Com. ex rel. Denny v. Murdock*, 94 Pa. Superior Ct. 59, 62. In *Com. ex rel. McTighe v. Lindsay*, 156 Pa. Superior Ct. 560, 562, 40 A. 2d 881, we said: "Because he is obligated by law to maintain and educate his children, a parent has the legal right to the custody of his child. This right is not absolute, but still it is so moving and cogent that it is forfeitable only by misconduct or by other factors which substantially affect the child's welfare." See also *Com. ex rel. Fell v. Brown*, 100 Pa. Superior Ct. 353. The paramount consideration in cases of this nature is at all times the welfare of the child, which includes its physical, intellectual, moral and spiritual well-being, and all other considerations are subordinate. *Com. ex rel. Kuntz v. Stackhouse*, 176 Pa. Superior Ct. 361, 363, 364, 108 A. 2d 73. However, the parent's prima facie right to custody may be forfeited if convincing reasons appear that the best interest and permanent welfare of the child will be served by awarding custody to someone else. *Com. ex rel. Burke v. Birch*, 169 Pa. Superior Ct. 537, 539, 83 A. 2d 426.

"An infant is the ward of the state and the latter may take the custody of the child away from even its

own parents when the welfare of the child so demands." *Com. ex rel. Children's Aid Society v. Gard*, 362 Pa. 85, 92, 66 A. 2d 300, 304.

"The governing criterion is, in all cases, the welfare and best interest of the child. To this the rights of the parents and all other considerations are subordinated, and each case must be viewed in relation to the happiness, training, development and morals of the infant." *Hixon's Appeal*, 145 Pa. Superior Ct. 33, 35, 20 A. 2d 925.

"Although the expressed wishes of the children are not controlling, . . . they constitute a factor which should be carefully considered." *Com. ex rel. Goldbaum v. Goldbaum*, 161 Pa. Superior Ct. 131, 135, 53 A. 2d 746.

In *Com. ex rel. Stevens v. Shannon*, 107 Pa. Superior Ct. 557, 563, 164 A. 352, we said: "Even the preference expressed by a child must be based on good reasons, and the child's maturity and intelligence must be considered." See also *Com. ex rel. Brown v. Lane*, 90 Pa. Superior Ct. 350, 352; *Com. ex rel., Appellant, v. Tyrrell*, 115 Pa. Superior Ct. 385, 386, 387, 175 A. 723; *Com. ex rel. Conway v. Preston*, 148 Pa. Superior Ct. 182, 186, 24 A. 2d 772.

The law does not set an age over which the wish of the child is to be respected. The intelligence of a child is important and the wish should be based on real reason. 22 Temp. L.Q. 297.

Although religion is an important matter and must be given consideration, it does not, in itself, determine the right of custody. *Com. ex rel. Kuntz v. Stackhouse*, supra; *Com. ex rel. Burke v. Birch*, supra; *Com. ex rel. Donie v. Ferree*, 175 Pa. Superior Ct. 586, 106 A. 2d 681.

The lower court found that Joanne has an intelligence far beyond that normally possessed by a child of

her years. When asked whether she loved her father when he bought a ring for her, she said, "You don't love people for buying things." Again when shown snapshots to prove she was happy with her father, she replied, "I can bring a whole stack of them in when I was with Aunt Evelyn and Uncle Charley and Chucky, if you want to have pictures. They really don't mean too much."

A reading of the entire record convinces us that it would be cruel to force this child to go with her father at this particular time. She has been away from him for five years and she has been happy, well cared for and has developed into an exceptionally well adjusted and emotionally stable child. She loves the Allens as much as any child could love its own father and mother. She loves her school and her church and she has acquired many friends in her present environment. The great progress which has been attained in the development of this child is an existing fact which might be lost by a new experiment.

To gamble with the future welfare and happiness of a child who has been the victim of a broken home would be cruel and unwise.

All of us agree that the order of the lower court should be affirmed.

Order affirmed.