Commonwealth ex rel. Shroad, Appellant, *v.* Smith.

446

Argued September 30, 1955.  Before Rhodes, P. J.,
Hirt, Ross, Gunther, Wright, Woodside, and Ervin,
JJ.

Louis Lipshitz, for appellant.

Harry D. Sporkin, with him Jacob B. Abrams, for
appellees.

Opinion by Woodside, J., January 17, 1956:

This is a habeas corpus case in which the Municipal
Court of Philadelphia refused Vincent J. Shroad, Jr.
full custody of his son, John, now eleven years old.
The boy has been residing with his maternal grand-
parents since his parents separated about ten years
ago.

John's parents were married in 1942.  He was born
August 2, 1944.  About a year after his birth his par-
ents separated and were divorced.  The mother of the
boy took him to the home of her mother and stepfather,
Mr. and Mrs. Edward Smith, the respondents in this
case.  John's mother worked as a supervising nurse
at the Nazareth Hospital and resided there. She visited
her parents and John over the weekends.  On Septem-
ber 24, 1954 the mother died, and the father immedi-

ately brought this action to gain full custody of his son.

After a hearing on May 23, 1955 Judge GILBERT entered an order dismissing the father's petition. From this order the father appealed.

John is a bright, mannerly, well adjusted boy. The grandparents have given him a good home. He attends St. Bartholomew's Roman Catholic School where he won highest scholastic honors in his class for three consecutive years. He is an altar boy, a cub scout and has a "club" which meets in his grandparents' home. Each summer he spends his vacation with the Smiths at Ocean City, Md. The Smiths have applied for his admission to St. Joseph's Preparatory School to prepare the boy for a college education, with a view to his becoming a doctor if he so desires. They have bought bonds for his college education and placed his mother's insurance money in his name to be given him or spent upon his education later.

Mr. Smith is a die setter who worked for one firm for 20 years until it went out of business. He has been working for his present employer 22 years and earns $110 per week. He appeared to the trial court to be "a steady, reliable man." The Smiths own their home at 2129 Betts Street, Philadelphia.

The record of the father is in direct contrast to that of the grandparents. Since he left his second wife about nine years ago the appellant has lived at two addresses in Philadelphia; in Dover, Delaware; Wilmington, Delaware; Clifton, New Jersey; and Levittown, Pennsylvania. During the seven years immediately preceding the hearing he was employed by Brown Instrument Co. in Philadelphia; Autocar Company in Ardmore; International Latex Corporation in Dover, Delaware; at "odds and ends jobs"; by Sears Roebuck,

Turner Supply Company and Erdle's Store in Dover, Delaware; National Vulcanized Fiber Company in Wilmington, Delaware; Federal Telephone and Radio Corporation in Clifton, New Jersey; Keiser Metal Products in Bristol; and Dennis Mitchell Industries in Philadelphia. Before accepting employment from his last employer in November 1954 he testified that when he lost his prior job in April, "I decided I was going to take a vacation."

Appellant has been married three times. His first two marriages ended in divorce. He married his third wife in May 1949. He was a member of the Catholic Church, but was excommunicated. After the death of his second wife, John's mother, he was reinstated and is now a member in good standing.

Appellant has title to the house in which he and his wife reside. It is mortgaged. They have no children.

Appellant has suffered from epilepsy since he was 13 years old. He keeps it under control through medication taken three times daily. He has a seizure approximately once a year. He testified that it has never interfered with his employment. Although not a pleasant thing to witness the medical examiner of the municipal court, after examining the appellant, advised the court that the appellant's condition should not prevent his having custody of his son, and that if the condition were properly explained to John he should suffer no ill effects from witnessing a seizure.

A parent should not be denied custody of a child solely because he is suffering from occasional attacks of epilepsy, but it is a matter to be taken into consideration along with all the other facts.

The father sought partial custody of the boy and obtained a court order on March 8, 1946 giving him custody every Saturday afternoon from 1 to 6 o'clock.

In 1947 his petition for longer visitation was dismissed. By agreement of the parties he now has custody of his son every weekend. He was under court order to pay $10 per week for the support of the child. He has complied with this order.

Although the father never lost contact with his child he was not as faithful as he might have been, and did not take full advantage of the time allotted him by the court for visitation. John said that before his mother died his father "hardly ever came to see" him.

The lower court said of the appellant in its opinion:

"All of this testimony indicates few attempts on his part to see the boy, despite permission to visit him weekly granted by this court March 8, 1946, supra, and throws considerable doubt upon his reliability as a father to supply the economic and spiritual needs of his boy, upon the sincerity of his desire to visit him, and as well upon his own credibility as a witness.

"A reading of the transcript generally will provide further support for this interpretation of his testimony."

Mrs. Smith is 56 years of age, Mr. Smith 58, the appellant 36 and his wife 26. The late fifties may not be an ideal age to be rearing an eleven year old boy, but neither is a stepmother only 15 years older than the boy an ideal age for a parent.

Judge GILBERT took the boy into his chambers and questioned him in the presence of the assistant district attorney and the court stenographer who reported the proceedings. The judge demonstrated great understanding in questioning John. The boy showed no bitterness toward his father, but was emphatic in his requests to continue living with his grandmother. If there could be any complaint about the questions asked

John by the court it should come from the appellees and not the appellant, for it is clear that many of the questions were directed toward persuading the boy to say he was willing to be placed in the custody of his father. John, nevertheless, persisted time and time again in his request to remain with his grandmother. In his discussion with the court John demonstrated intelligence and maturity for a boy of his years. He told, among other things, that his stepmother swore and used bad words, something he was never accustomed to at his grandparents' home. Pressed numerous times for reasons why he did not wish to reside with his father he gave some that were good and some that were not.

Although a boy not yet eleven years old, does not have the experience or maturity to *decide* his own custody, nevertheless his wishes are an important factor to be considered.

If properly safeguarded by the trial judge, the child's examination by him can be very helpful in determining what will be to the best interests and permanent welfare of the child. A trial judge questioning a child should have no great difficulty in determining whether the child has good reasons to prefer one home over another. He also can learn a great deal about the child's training.

Judge GILBERT had the advantage of seeing and hearing not only the boy, but the grandparents, the father and the stepmother.

Any experienced trial judge, while conducting a hearing which involves the custody of children, is observing every act of the parties, not only to appraise the truth of their testimony, but also to evaluate their fitness to have custody of the children. An appellate court lacks this opportunity to pass upon the ability and character of the parties. *Com. ex rel. Hubbell v.*

*Hubbell,* 176 Pa. Superior Ct. 186, 193, 107 A. 2d 388 (1954).

An appellate court is not free to nullify the fact-finding function of the hearing judge. The credibility of witnesses and the weight to be given to their testimony by reason of their character, intelligence and knowledge of the subject can best be determined by the judge before whom they appear. *Com. ex rel. Harry v. Eastridge,* 374 Pa. 172, 177, 97 A. 2d 350 (1953).

The natural parents have the primary right to their child's custody, but there is no fixed and invariable rule that a natural parent who is of good moral character is entitled to custody in all circumstances. Each case must finally rest on and be determined by its own facts. *Commonwealth ex rel. v. Cook,* 122 Pa. Superior Ct. 397, 399, 186 A. 229 (1936).

Compelling reasons must appear before a parent will be denied custody of his son. *Com. ex rel. Harry v. Eastridge,* supra. We think there are compelling reasons in this case, overwhelmingly established by the testimony.

As Judge ERVIN said in *Com. ex rel. Shamenek v. Allen,* 179 Pa. Superior Ct. 169, 175, 116 A. 2d 336 (1955) : "The paramount consideration in cases of this nature is at all times the welfare of the child, which includes its physical, intellectual, moral and spiritual well-being, and all other considerations are subordinate . . . the parent's prima facie right to custody may be forfeited if convincing reasons appear that the best interest and permanent welfare of the child will be served by awarding custody to someone else."

The boy has the security of a good home in which his religious, educational, moral, recreational and financial interests are receiving assiduous attention. There are indications of loving care in the home.

It is the only home he has ever known. If the child had been living with his mother and it would now be necessary to find a new place of abode where he would have to adjust to new ties as a result of her death the answer to our problem might not be so clear, but here the father is making his first real effort to get complete custody of an eleven year old boy who has the continuing security of a better home life than the father can furnish. The ties which bind this boy to his grandparents cannot be severed without great risk to his welfare.

As stated by the court below: "After a careful consideration of the whole record we conclude that arbitrarily to uproot this boy from an environment in which he has been reared and nurtured by people whom he loves and respects, and transplant him to another environment against his will, might well result in his economic, mental and emotional disruption and confusion. The circumstances here presented do not justify so great a risk."

Based upon the father's past, which is our best guide to his future, he does not offer a very satisfactory home for his son. The father has had difficulty with his church. He has had difficulty with his wives. He has had difficulty in holding a job. He has moved frequently from job to job, city to city and state to state. He has not demonstrated the love and concern for his son which he might have.

To take this child from his present home and place him in the custody of his father would be against the child's best interests.

Order affirmed.