Commonwealth ex rel. McNamee *v.* Jackson, Appellant.

Argued October 5, 1956. Before Rhodes, P.J., Gunther, Wright, Woodside, Ervin, and Carr, JJ. (Hirt, J., absent).

*Harry D. Sporkin*, with him *Jacob B. Abrams*, for appellant.

*Francis E. Shields*, with him *Pepper, Bodine, Frick, Scheetz, & Hamilton*, for appellee.

Opinion by Woodside, J., June 11, 1957:

This is an appeal from an order of the Municipal Court of Philadelphia granting custody of two minor children to their father, who had instigated this habeas corpus proceeding against Marguerite and George Jackson, the children's maternal grandparents.

The mother and father were married June 28, 1940. They had two children, James F. McNamee, Jr., born December 2, 1942, and Joseph Gregory McNamee born October 18, 1947. On October 18, 1948, the mother and father separated, the two boys remaining with their mother who resided with her mother and father, the defendants in this action.

On November 2, 1951, the petitioner and his wife were divorced. Three months and two days later the petitioner married Helene O'Brien.

The mother of the two boys died May 9, 1952.

By agreement of all concerned, the children continued to live with their maternal grandparents after their mother's death. Their father contributed $20 a week to their support, and visited them weekly.

On January 17, 1956, the father instituted this action. After a hearing, the lower court awarded the children to their father, giving to the grandparents "liberal rights of visitation."

James, who is now fourteen years of age, told the trial judge that he preferred to live with his grandparents. The trial judge, although he interviewed Joseph, did not ask him where he preferred to live.

At the time of the hearing, the grandmother was 60 years of age, the grandfather 63, the father 37, and the stepmother 28. The grandparents lived in Philadelphia, and the father and his present wife lived in Wayne.

Both the father and stepmother were working. The stepmother testified that she would stop her employment and devote full time to the children's care if the court awarded them to their father. The father is employed by the Westinghouse Electric Company as an elevator maintenance man, earning between $10,000 and $12,000 annually.

The lower court found that the grandparents have cared for the children faithfully and well, that they loved the children, and that the children loved them. Their fitness to keep the children was not questioned.

After careful consideration of the case we had unanimously decided to reverse the lower court, and to permit the custody of the children to remain in the grandparents. Prior to the filing of our opinion, however, the grandfather, George Jackson, one of the appellants, died.

Acting as an officer of the court, counsel quite properly called our attention to this change of status. We

thereupon requested counsel to file a stipulation suggesting the death of George Jackson, and informing us of the residence and members of the household of Marguerite Jackson, since the death of her husband. We also directed that the case be reargued with particular emphasis being placed upon any change which the death of the grandfather had upon the merits of the case.

After reconsidering the case in the light of the changed circumstances, we remain unanimously of the opinion that it would not be to the best interests of the children to take them from their grandmother, and to compel them to reside with their father and stepmother.

We have so concluded with full realization that prima facie the parent is entitled to the custody of his children. *Commonwealth ex rel. Miller v. Barclay,* 96 Pa. Superior Ct. 315 (1929); and that experience has shown that generally children's welfare is best promoted by entrusting their future to their parents. *Nangle Petition,* 172 Pa. Superior Ct. 629, 95 A. 2d 341 (1953).

We also recognize that the trial judge has an opportunity to evaluate the fitness of the parties to have custody of the children through observation of the parties which an appellate court lacks. *Commonwealth ex rel. Shroad v. Smith,* 180 Pa. Superior Ct. 445, 450, 119 A. 2d 620 (1956).

Giving all these matters their proper consideration, we are still of the opinion that it would be to the best interests of the children to remain with their grandmother, providing liberal rights of visitation are given to the father.

It is basic and fundamental that the paramount consideration is the welfare of the children and that all other considerations, including the rights of par-

ents, are subordinate to the children's physical, intellectual, moral, spiritual and emotional well being. *Commonwealth ex rel. Kuntz v. Stackhouse,* 176 Pa. Superior Ct. 361, 363, 364, 108 A. 2d 73 (1954).

An examination of the record indicates that the court below said during the trial that "the only question is actually the fitness of the father." This, of course, is not the only question. Even when the fitness of the father is conceded, the welfare of the children may require that their custody be in some other person.

Upon reading the record one finds four signposts clearly pointing the way this case should be decided.

First, the children have been reared to consider the residence of their grandmother as their home. They have found there the love and atmosphere which is conducive to their welfare. Even after their mother died, they were permitted to remain with their grandparents, without question from the father for over 3½ years, during which time they grew to look upon their grandmother as their "mother". By permitting these children to reside with their grandmother, we are not gambling with their future welfare and happiness, as we would be doing were we to compel them to live with their father and his present wife.

In the second place, the older child is emphatically opposed to leaving his grandmother to live with his stepmother. He told the trial judge that he does not like his stepmother, and said he could not learn to like her. He said he did not like to say what he thinks of her out loud, but he did tell his father once that he hated her, and didn't want to be around where she was.

He said she and his father took his brother and him to a taproom where she became involved in a brawl and "there was a lot of argument and yelling . . . and my father hit her on the arm and knocked her purse

on the floor, and she and Johnnie Gleason called a lot of names".

Although the expressed wishes of the children are not controlling, they constitute a factor which should be carefully considered. *Commonwealth ex rel. Shamenek v. Allen,* 179 Pa. Superior Ct. 169, 176, 116 A. 2d 336 (1955).

The younger child was not asked his preference, but indicated no desire to leave his grandmother for his father. There is no good reason why these boys should be separated. See *Commonwealth ex rel. Reese v. Mellors,* 152 Pa. Superior Ct. 596, 598, 33 A. 2d 516 (1943).

In the third place, the father was spending very much of his time with his present wife, while he was still married to and living with the mother of these boys. Strange as it may seem, the evidence shows that he frequently "went out" with his second wife while he was married to his first wife, and with his first wife while he was married to his second wife. Evidence of adultery is lacking, but he made no effort to hide his interest in his present wife while still married to the boys' mother. He married his present wife two days after the time expired for appealing from the decree divorcing him from his first wife. The older boy was conscious of his father's conduct, and, sensing that it was wrong, developed an understandable antipathy toward his stepmother.

In the fourth place, the father drank too much. Four witnesses told of the father's intoxication. They said he was "terribly intoxicated"—"very, very much intoxicated"—"intoxicated many times"—"he would come home late in the evening in his working clothes, obviously drinking"—"he was visibly intoxicated and in his stocking feet (on the street carrying his child)" —"I know he was intoxicated because he could not walk on his own power"—"I have seen him laying on

the front steps of his home just before dawn."—"For the next several years he was never sober on Christmas"—"he was drinking to excess."

The testimony concerning many of these occurrences was not specifically denied by the father. The denials which he did make were not convincing. We quote from his testimony: "Q. Weren't you intoxicated? A. No more than anyone else . . . I had a couple of highballs, but I wasn't influenced by it . . . Q. From 1940 to the present time didn't you drink excessively of hard alcoholic beverages? A. No more than anyone else does, the average person I would say . . . Q. Were you sober when you left? A. I had been drinking and was under the influence when I left."

The trial court may have been justified in finding that "the evidence does not indicate that he is an alcoholic," but it was not justified in ignoring the overwhelming weight of the evidence establishing that he did drink intoxicating beverages to excess a number of times, including occasions when his children were present.

Upon reading the record in this case, we concluded that we would be derelict in our duty if we did not refer to our annoyance at the repeated frivolous objections to testimony and continual unwarranted interruptions of the witnesses. A trial judge can be diverted from the issues of a case by being required to rule upon frivolous objections of the type made in this case by the defendants' counsel (not now appearing of record here).[1]

---

[1] There were 25 objections or interruptions by defendants' counsel during the plaintiff's direct examination, which even with the objections and arguments of counsel, covered only 20 pages of the notes of testimony.

The record shows the following objections to the first four questions asked another witness: "Q. Where are you employed? A. Smith, Kline & French. Q. What is the nature of your employ-

In a recent address given by the Honorable HORACE STERN, retired Chief Justice of the Supreme Court, he

ment? Mr. X: Objected to . . . Q. Where is your job position located with reference to the job position of Mr. McNamee? Mr. X: I object and ask for an offer of proof. It is not relevant . . . Q. When did you start working for Smith, Kline & French? Mr. X: I object to that as a leading question."

Examining only 17 pages of testimony, and omitting many objections found on them, we note the following: "Q. Have you been in the McNamee home on occasions either alone or in company of other people? Mr. X: If your Honor please, that's objected to as immaterial and irrelevant . . . Q. Have you been there for parties? Mr. X: Objected to as immaterial and irrelevant . . . Q. Did Mr. McNamee ever drink excessively on any occasions? Mr. X: Objected to as leading. Q. To what extent did Mr. McNamee drink on these occasions? A. I have never seen him drink to excess. Mr. X: I ask that it be stricken as not responsible and a matter of opinion. Q. On any occasions when you were in the home did Mr. McNamee stagger? Mr. X: Objected to for the same reasons . . . Q. Do you know the reputation of the McNamees in the neighborhood? Mr. X: That's objected to . . . Q. Do you do the same kind of work (as Mr. McNamee)? Mr. X: Objected to as immaterial and irrelevant. We don't care what he does . . . Q. Have you had occasion to drink together with Mr. McNamee? Mr. X: Objected to . . . Q. On those occasions can you tell the Court how many drinks and what kind of intoxicants Mr. McNamee would have? A. Well, we would—Mr. X: I object to that question first for the broadness of it; and second, that we know as a matter of natural human beings, when we go out together we don't count—we don't make an exact count of the number of drinks people have. This isn't like going out on a golf course and counting your strokes . . . Q. On those occasions when you drank with Mr. McNamee did he do anything which you observed, or did he say anything which you heard that indicated to you that he had drank excessively? Mr. X: It is a matter of personal conclusions . . . Q. Do you know whether or not Mr. McNamee is on the job every day? Mr. X: Objected to. Only the employment records will show that, and that is the proper way to prove it . . . Q. Did Mrs. McNamee indicate at any time or in any way she had drank excessively? Mr. X: I object to that, it's an opinion, 'Did she indicate?' Did she do or say anything which indicated that? Q. Did she do or say anything which would indicate—Mr. X: That is objectionable."

decried the excessive use of objections to testimony made during trials in Pennsylvania, and told of sitting for days in England while negligence cases were being tried before juries without hearing a single objection to testimony, even when questions clearly objectionable were asked. We do not mean to suggest that objections to testimony are not desirable, and often extremely important. We are of the opinion, however, that justice can be defeated by frivolous and too frequent objections as well as by the failure of counsel to object to improper testimony. Particularly is this true when the case is being heard by the court without a jury.

After carefully examining the record in this case and giving due consideration to the arguments and the ably prepared briefs which have been submitted to us, we are of the opinion that the lower court should be reversed, and that the custody of the two children in question should remain with the grandparents, and that the father should be given liberal rights of visitation subject to such regulation as the court below deems proper.

The order is reversed, and the record remitted for the entry of an order consistent with this opinion.