## Commonwealth ex rel. Wagner, Appellant, *v.* Wagner.

Argued June 14, 1960. Before RHODES, P. J., GUN-THER, WRIGHT, WOODSIDE, ERVIN, and MONTGOMERY, JJ. (WATKINS, J., absent).

*Joseph J. Duffy,* for appellant.

*Joseph D. Shein,* for appellee.

OPINION BY WOODSIDE, J., September 16, 1960:

This is an appeal by the mother of a three year old boy from an order of the Municipal Court of Philadelphia granting custody of the child to its father.

The parents of the child are separated, each living with their respective parents. There is evidence that the living quarters of the mother are more satisfactory for the rearing of the child than those of the father. However, the trial judge seemed to entertain no doubts that the welfare of the child would be best served by permitting him to remain with the father. The mother was given visitation rights.

The burden is upon the appellant to establish that the order of the lower court is erroneous or that it is based upon error of law. *Commonwealth ex rel. Butler v. Ervine,* 182 Pa. Superior Ct. 179, 182, 126 A. 2d 512 (1956).

Judge GILBERT, who tried this case, had the advantage of seeing and hearing the parties. Any experienced trial judge, while conducting a hearing which involves the custody of a child, is observing the parties in the courtroom, not only to appraise the truth of their testimony, but also to evaluate their fitness to have custody of the child. An appellate court has no such opportunity to pass upon the ability and character of the parties. *Commonwealth ex rel. Shroad v. Smith*, 180 Pa. Superior Ct. 445, 450, 119 A. 2d 620 (1956); *Commonwealth ex rel. Hubbell v. Hubbell*, 176 Pa. Superior Ct. 186, 193, 107 A. 2d 388 (1954).

In custody cases, the paramount consideration is the welfare of the child, and all other considerations, including the rights of parents, are subordinate to the child's physical, intellectual, moral, spiritual and emotional well being. *Commonwealth ex rel. McNamee v. Jackson*, 183 Pa. Superior Ct. 522, 525, 526, 132 A. 2d 396 (1957).

The trial judge wrote an exhaustive opinion in which he reviewed the evidence in detail and set forth at length why he believed the welfare of the child would best be served by continuing custody in the father.

In discussing the marital relations of the parties, Judge GILBERT said, "It seems clear she had no real affection for [her husband]. It is apparent, too, that he is in better balance, emotionally and morally, and possesses a greater amount of common sense."

Discussing the wife's emotional instability the court said: "She made several threats to commit suicide and 'take the baby with her.' On one of these occasions, September 7, 1958, she left a suicide note, in her handwriting, in their home at Maple Shade, New Jersey, enclosed in an envelope, inscribed by her with the words, 'To be opened only after my death', both note and envelope over her signature, and disappeared from

the house, leaving the baby at home. The note and envelope are part of this record. In the note she refers to her husband as 'a wonderful, happy-go-lucky guy who deserves the best', and confesses that 'my life has been a complete failure to both my husband and family' and that 'I seem to be the only rotten apple in the barrel.' . . . On another occasion she lit a match and threatened to burn up the house. Her husband testified without objection that she told him she had a nervous breakdown during her school days, . . ."

Concerning the mother's interest in a man named Charles Gober, the court had the following to say: "During the months of April, May, June and July, 1959, Mrs. Wagner would pick Gober up in her car and drive him to his home in Feasterville, to his work in Philadelphia, and to his boat at Croydon. She returned home at late hours to Maple Shade, from 11 P.M. to as late as 2 A.M. . . .

"During this period the baby was moved about in automobiles to and between the various addresses referred to hereinabove with too great frequency, obviously on some occasions to facilitate clandestine meetings between Gober and Mrs. Wagner. 'The baby', said Wagner, 'was up until 11:00, 12:00, 1:00 or 2:00 o'clock in the morning. My wife didn't bring him home from the boatyard [at Croydon] until that time of the morning'. The circumstance that while driving Mrs. Wagner has been involved in several automobile accidents posed an additional threat to the child's safety."

Referring to another occasion the court continued: "Suiting the action to the word, Gober and Mrs. Wagner, taking the baby with them, left the boat at 3 A. M. . . . and drove to the matrimonial domicile of the Wagners at Maple Shade, in western New Jersey, about 65 miles distant by automobile, where, as it later developed, Gober spent the balance of the night from 4:10

44

A. M. until at least 7 A. M., with Mrs. Wagner and their baby, then two years seven and a half months old . . .

"[Wagner] entered the house by 'yanking' open a hooked screen door and reaching through a pane broken by his wife to open the inside door, and found her and Gober lying together on a day bed in the living room under 'a pink sheet', both of them 'without any clothes on whatsoever', and 'with Gober's hand where it should not have been'. He had to 'slap' his wife 'two or three times' on the 'fannie' to 'wake her up', whereupon she said to him, 'What difference does it make, I just got over my period.' He said that Gober showed no inclination to rise from the bed. He added, 'I remember the sheet very well'.

"There was ample evidence in the living room and the kitchen, by the presence of liquor bottles and equipment for mixing drinks, to indicate that Gober and Mrs. Wagner had been drinking, a fact which they admitted, though reluctantly.

. . .

"Wagner drove alone to Philadelphia, where he has since resided at his parents' home separately from his wife.

"The next day, July 31st, after making some phone calls in an endeavor to ascertain the whereabouts of his wife and baby, he drove again to the boat at Barneget Light, accompanied by a male friend, arriving 'just before dark', where (still in Gober's presence) he forcibly took the baby from his wife, left the boat with it, and drove to his Maple Shade home and then to his parents' home at 1424 Princeton Avenue, Philadelphia, where he and the baby have since resided. Mrs. Wagner later returned to her parents' home at 1108 Arrott Street, Philadelphia.

"The testimony shows that the baby has been well cared for since that time up to the dates of these hear-

ings. It has gained weight and a physician stated that the baby is in good health.

. . .

"There are other events and circumstances to which attention might be called, but to discuss all of them would require a longer opinion than is necessary. They include one instance, in June, 1959, when Wagner caught Gober, fully dressed, and Mrs. Wagner, in a nightgown 'up around her waist' and a housecoat 'that was wide open', lying together on a day bed in the Wagner living room; and another instance, also in June, 1959, testified to by Wagner's witness, Robert H. Kastner, 1315 Arrott Street, Frankford, Philadelphia, when Gober and Mrs. Wagner engaged in a near-midnight 15-minute kissing tryst in a car in the Kastner driveway.

"Promising to pick up by 3 P.M. the Wagner child which Mrs. Wagner had left at the Kastner home that morning 'with the idea of going down to the Shore with this fellow Carl', and failing to return for the child until 11:30 P.M. when she arrived at the Kastner home in the company of Gober, she was told by Kastner that, because of the late hour, the baby had been taken to the home of Mrs. Wagner's parents at 1108 Arrott Street. Although Gober and Mrs. Wagner testified it was only 10:20 P.M. when they arrived at the Kastner home, denied they spent any time in the Kastner driveway as charged by him and said they drove immediately the two blocks to her parents' home, presumably to get the baby, they admitted they did not ring the bell or knock on the door or even get out of their car upon reaching her parents home because they found 'the house dark', although it could have been, if they were telling the truth, not later than 10:30 P.M. when they arrived there. Without even stopping their car, they drove on without getting the baby or even learning whether the child was inside."

It appears to us from an examination of the record that the court below was warranted, for the reasons set forth above, in concluding that the welfare of the child will be best served by permitting custody to remain in the father, at least during the immediate future.

Order affirmed.