Commonwealth ex rel. Horan, Appellant, *v.*
Horan.

Argued June 20, 1960. Before RHODES, P. J., GUN-
THER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONT-
GOMERY, JJ.

*Harry R. Back,* for appellant.

*Conrad G. Moffett,* for appellee.

OPINION BY WOODSIDE, J., September 16, 1960:
This appeal involves two children whose custody
was given to the mother with rights in the father to
have them during the months of July and August and

during part of the Christmas holidays. The father, who brought the action in the Court of Common Pleas of Montgomery County, has appealed from the decree.

The parties have four children: John Joseph, Jr., age 14; Marguerite Ann, age 13; David, age 11 and Michael, age 8. The parents were married July 4, 1942, and lived together in Willow Grove. On March 6, 1959, Mrs. Horan left her husband, and without his knowledge, took the four children with her to a suburb of Detroit, Michigan, where she went to live with her brother.

April 21, 1959, shortly after she had brought an action for support, Mr. Horan appeared in Michigan, disguised with moustache and dark glasses. He found the two younger children, picked them up without their mother's knowledge, and brought them back to Willow Grove. He then brought this action to confirm the custody, which he had obtained of David and Michael. The custody of the other two children is not involved here. Whether one having custody can bring a writ of habeas corpus to "confirm" custody has not been raised or considered in this case. It would be best for all concerned for us to dispose of the case on its merits regardless of whether or not the action was properly instituted.

The paramount consideration here, as in all custody cases, is the welfare of the children. All other considerations are subordinate to the children's physical, intellectual, moral, spiritual and emotional well being. *Commonwealth ex rel. McNamee v. Jackson*, 183 Pa. Superior Ct. 522, 525, 526, 132 A. 2d 396 (1957).

Both parents are college graduates. Mr. Horan is an engineer employed at the Naval Air Development Center at Johnsville at a substantial salary. He and his wife started a gift shop in 1952, specializing in fireplace accessories which required installation. A con-

tractor chosen by the husband was employed to make these installations. The wife managed the gift shop while the husband continued his employment. She worked at the shop practically every day and frequently during the evenings. When the store was first opened, the four children were approximately 1 to 7 years of age, and required attention while their mother worked. In 1948 the parties obtained a young girl to look after the children and the house. She was the housekeeper until September 1957. With four small children, the mother and father away all day and the mother working many evenings, the home was not well kept.

Mr. Horan became jealous of the contractor employed by the parties in the gift shop business. He kept a log of the hours his wife came home; he watched her at the store; he followed her many times when she was driving her car; he watched homes in which he thought she might be; he took friends along with him in his car to watch her; he asked neighbors to note the hours she came home; he checked with the housekeeper's boy friend, who spent many evenings at their home; he contacted businessmen in the vicinity of her store. Few people have been more closely watched and checked upon over so long a time as were the defendant and her employee. Did Mr. Horan ever find them "in the embrace of each other?" "No." Once, when the housekeeper and her boy friend returned from the movies, the wife was in the kitchen in pajamas and a dressing gown, and the employee was in the living room fully dressed. The four ate together. There is no evidence whether or not her husband was in the house. Mr. Horan saw the employee take Mrs. Horan's hand when they left the employee's mother's home at night—she said, to help her over uneven steps. One afternoon the wife and the employee ate in a restaurant and he had his hand on her shoulder, said one witness.

Mrs. Horan had a miscarriage, which the husband insisted upon calling an abortion, and which he suggested was of a pregnancy not caused by him. It became clear from the evidence that he had intercourse with her a few months before the miscarriage, and that the miscarriage started in their store during business hours while her husband was in Washington, and that she called a nurse and her employee who took her to the hospital. Considering the complete investigation made by Mr. Horan, had there been any evidence that an abortion was committed, it would have been found and presented.

The contractor-employee has a wife and two children with whom he was and is residing. The court below found the friendship between Mrs. Horan and her employee "improper" but "certainly not to the point that it disqualified the mother to have custody of her young brood." Mrs. Horan came home late one night and found her husband partly clothed and the housekeeper lying on his bed in her night clothes, watching television. Possibly, both of the parties to this action were guilty of indiscretions, but there is nothing from which it could be concluded either committed adultery.

Mrs. Horan is living with her brother in a suburb of Detroit, Michigan. The house, located on three acres of land, is worth approximately $30,000. It is in "a very good neighborhood." The father contends the Michigan home is not a proper place for the children because the lawn was not mowed, a venetian blind in the house was askew, the brother is divorced, and in 1954 the brother was cited for the unsanitary condition of his garage. Mr. Horan brought a Detroit policeman into Montgomery County to testify that the brother formerly operated a drive-in restaurant where some patrons were arrested for selling liquor to other patrons.

The mother is a well educated, energetic woman. Her people live in a good neighborhood and are "wealthy", according to her husband's testimony. Her brother earns $300 per week as a salesman; her sister has a master's degree and teaches music; her brother-in-law is a counsellor at the Detroit Juvenile Detention Home. She made a favorable impression upon the hearing judge. She "gave no indication of sharing the father's highly combative and 'know-it-all' manner. The mother simply did not answer the slovenly, slothful, smutty and sluttish description given by the father. Nor did she appear to be the type of mother who would bear no affectionate regard for her offspring and hence would neglect them."

On the other hand, the court below doubted the father's credibility. He "appeared to the hearing judge as a self-esteemed trial technician." The hearing judge "carefully studied" the parties, and his impression of the father was unfavorable. Confined to the printed record, we lack not only the opportunity to appraise the credibility of witnesses by observing them, but we also lack the opportunity which the hearing judge has to evaluate the parties themselves through hours of observation. See *Commonwealth ex rel. Shroad v. Smith,* 180 Pa. Superior Ct. 445, 450, 119 A. 2d 620 (1956); *Commonwealth ex rel. Hubbell v. Hubbell,* 176 Pa. Superior Ct. 186, 193, 107 A. 2d 388 (1954).

From a careful examination of the over 600 pages of testimony, we concluded that the evidence supports the findings and decree of the court below.

The father's self-portrait carries the characteristics of a suspicious, self-righteous, deceitful, selfish, mean man. We have referred to the extent to which he went in order to pin misconduct upon his wife and her employee. During the hearing he called the employee's home, posing as his wife's counsel. Over a long period

of time, he invited a number of neighbors into their home and took them through the house—kitchen, bedrooms, bathroom, basement and all—to note its untidiness.

He took numerous pictures of clothing on the beds, dishes in the sink and similar untidy conditions, some of which, it appeared from the children's testimony, he had deliberately helped to create. We must remember that during nearly all of this time the housekeeper, and not his wife, was looking after the house. "Mrs. Horan was an excellent housekeeper up until the time we got the maid," he said. He attacked the employee in the store, and his wife tried to stop him. "That is the only time she got a good set of bruises from me up and down both arms," he volunteered during direct examination. He took pictures of her about the house against her will. Finally, when she attempted to get the camera from him, a fight ensued during which she was thrown to the floor, and for which he had her locked up at 9 o'clock at night for assault and battery.

The father said that he feared the food served to him by his wife had been poisoned. Therefore, he would trade plates with one of his children. If his fear of poison was not genuine, it was contemptible for him to suggest to the children of tender age that their mother was a potential murderer, and to plant in their minds fear and distrust. If his fears of poison in his food were genuine, what manner of man is he who would give food he thought tainted to his children and risk their eating it in order to assure his personal safety? Not since the days of Solomon has one seeking custody of a child fallen unconsciously into a more conclusive exhibition of lack of love and consideration for a child.

The father is now 50 years of age. When he brought the children back from Michigan he persuaded his mother to leave her home in Buffalo, New York, and

come to Willow Grove to care for them. She says she does not know how old she is. She "thought" last year that she was 68 or 69.

As is generally the situation in custody cases, neither the father's home nor the mother's home is ideal for the rearing of children, but we can find no reason to conclude that the court below erred in its choice.

Decree affirmed.

DISSENTING OPINION BY MONTGOMERY, J.:

Cases involving custody of children are always difficult and no set rules can be applied in every case, with possibly one exception. That exception is the rule that the child's welfare is of paramount importance. The welfare of children encompasses their physical, intellectual, moral, spiritual, and emotional well being, as recited in the majority opinion in quoting from *Commonwealth ex rel. McNamee v. Jackson,* 183 Pa. Superior Ct. 522, 132 A. 2d 396. However, what is best for the child may lead to a difference of opinion.

The lower court seems to emphasize the importance of preserving the family group and concludes that it would be best for the four children if they were maintained together under the mother's guidance. This conclusion is correct only if the means of maintenance, the environment, and the emotions of the children are conducive to a happy family relationship. Sometimes a large group of children renders their maintenance difficult. In the present case it is not difficult to foresee also that, if this matter is resolved in the way the lower court resolved it, there will be continuing conflicts between the parents. Undoubtedly these will have a harmful effect upon the children. Everything else being equal, serenity and contentment should, in my opinion, determine the outcome of this case.

It is apparent from the record that the two boys have a deep affection for their father, which is indicated by their request to the lower court that they be permitted to remain with him. I think that their welfare would be better served if that relationship with their father were to continue.

There is nothing in the record, so far as I have been able to determine, and nothing in the opinion of the lower court that indicates in any way that this father is unfit to maintain his two sons, unable to do so, or disinterested in assuming the responsibility for their maintenance and education. His bizarre actions in the conduct of his case in the lower court, in his efforts to determine the activities of the wife before they separated, and in retrieving the two children after they had been taken by the mother from his home were undoubtedly caused by a suspicion of infidelity on the part of his wife which inflamed his emotions and clouded his judgment. Although his actions are not to be approved, they should be viewed with understanding because there was some justification for his suspicion of an improper relationship between the mother and a man who was employed in their joint business. The lower court stated, "An improper friendship did exist with the employe, but the proof fell short of establishing an adulterous relationship." A suspicion of infidelity can cause great mental and emotional disturbance leading to strange and abnormal reactions, especially when the suspicion has some basis in fact.

Repeating what I have previously stated, I believe that the welfare of the two children involved in this proceeding, as well as of the two children remaining in the custody of the mother, will be best served by preserving the status of the parties in the manner it existed at the time the lower court heard this case rather than by disturbing it as it did.

I would reverse the order of the lower court; and I therefore respectfully dissent from the majority opinion of this Court in affirming it.

WRIGHT, J., joins in this dissent.