## Commonwealth ex rel. Traeger v. Ritting

*William F. Fox*, for petitioner.
*John P. Yatsko*, for respondent.

DITTER, J., August 11, 1965.—The mother of five minor children brought this habeas corpus action against her former husband. After hearing, we granted

visitation privileges but refused to award permanent custody to her. She has appealed our ruling to the Superior Court.

Petitioner, Mary E. Traeger, and her former husband, Richard J. Ritting, are the parents of two sons, Richard and David, aged 18 and 15, and three daughters, Susan, Deborah, and Dawn, aged 13, almost 12, and 7, respectively.

In January 1964, after approximately 20 years of marriage, petitioner, who is an attractive woman of 37, left her husband, children and the home in which the parties resided, obtained an uncontested divorce in October 1964, and remarried in December 1964. Shortly after the divorce action was instituted, she signed a settlement agreement with her then-husband, under the terms of which she conveyed to him all of her rights in their jointly owned real and personal property and agreed that he should retain custody of the children. There were only two things which she kept: her Cadillac automobile, on which there was an encumbrance of $3,000, and her personal clothing.

Sound, well-known principles must guide our determination of the issues in this case:

1. "It is basic and fundamental that the paramount consideration is the welfare of the children and that all other considerations, including the rights of parents, are subordinate to the children's physical, intellectual, moral, spiritual and emotional well-being": Commonwealth ex rel. McNamee v. Jackson, 183 Pa. Superior Ct. 522, 525 (1957).

2. It is the policy of the law to keep children of a family together: Commonwealth ex rel. Doberstein v. Doberstein, 201 Pa. Superior Ct. 102, 106 (1963). They should only be separated for good reason: Commonwealth ex rel. Martino v. Blough, 201 Pa. Superior Ct. 346, 351 (1963).

3. In awarding custody, consideration should be

given to the preferences of the children: Commonwealth ex rel. Doberstein v. Doberstein, supra, 106. As a child grows older, greater weight will be given to his preference: Commonwealth ex rel. Bender v. Bender, 197 Pa. Superior Ct. 397, 401 (1962).

4. Courts are not bound by agreements between parents as to custody since these must yield to the best interests of the children. However, such an agreement may be considered in determining a question of fitness: Commonwealth ex rel. Bordlemay v. Bordlemay, 31 D. & C. 2d 46, 51 (1963), affirmed per curiam, 201 Pa. Superior Ct. 435 (1963).

Throughout her marriage, petitioner worked as a waitress, averaging approximately $100 a week in salary and tips. Since she left home for her job at 4:30 in the afternoon and did not return until from 2 until 4 a.m., a maid was hired to look after the children. It was during this employment that petitioner met her present husband, Carl Traeger.

Mr. Traeger, age 42, is an executive in a company with offices in Philadelphia. When asked the range of his income, he modestly admitted that it was "Twenty-five plus," meaning more than $25,000. After he and petitioner were married, they took up residence at the Presidential Apartments, City Avenue and Monument Road, Philadelphia. He and Mrs. Traeger have a summer place at the shore and will buy a new house in Cherry Hill, N. J., sometime in the fall. Mr. Traeger explained that they had talked to the builder and the only question was ". . . what size home we are going to take, whether we are going to take a smaller home or a larger home, and we're in a position to take either one".

Once divorced and the father of a married daughter, Mr. Traeger stated he would be "happy" to have his wife's children come to live in his home. Although he had never met or talked with the four older children,

he has had contact with Dawn, who is seven. He stated that he felt he would be in a position to "handle" the children and would "make every effort" to love them.

Richard J. Ritting, petitioner's first husband, has not remarried. He is 40 years of age and is a self-employed asphalt stripper, apparently not a particularly glamorous occupation. His work requires that he leave the house at approximately 6 a.m. and permits him to return from 4:30 to 6 p.m. His hours are somewhat shorter in the winter, enabling him to get the children off for school before he leaves, and he is frequently home before they arrive in the afternoon. Although his precise income was not stated, it would appear from the description of his home, the hours he is required to work and the lack of servants in the house that his financial stature does not measure up to that of petitioner's new husband.

Mr. Ritting and the children reside in a four-bedroom house in Ardsley, where they had all lived with petitioner before the separation. It has a kitchen, dining room, large basement and a recreation room. He has a bedroom, the two boys have a bedroom and the three girls share a large bedroom. Mrs. Traeger agreed that it was adequate for their needs. She also made no contention that her former husband physically abused the children or failed to furnish them with adequate food, sufficient clothing and physical necessities. However, she felt that she could make better provision for their comfort, grooming and appearance. She explained that before the breakup of the family and while she was working as a waitress, her maid took care of the housework and the girls did not have to do very much of it. Since the separation, the girls help with the cooking, cleaning, washing and ironing. If the children were with her, since she no longer works, she could "stay at home and be a good mother to the children and raise them like they should be raised".

She added that the children were fond of each other, very affectionate, normal and well-behaved, and that it would hurt them to be separated. She also testified that when she left in January 1964, the children were terribly upset, had cried, and did not want her to go.

Through the cooperation and help of friends and relatives, the children are well taken care of, both winter and summer. The younger ones have constant adult supervision, and all have adjusted well to the changes that were brought about by their mother's leaving them and their father. They share household chores, are doing satisfactorily in school, attend church and are active in its affairs, are happy and are well-behaved.

Following the testimony that was heard in open court and in the presence of their parents' respective attorneys and the court reporter, the five children were interviewed separately in chambers. All of them indicated they wanted to stay together, they wanted to live with their father and they were not particularly interested in their mother. Richard, who is 18, does not know his mother's new husband and does not want to know him, and Dawn, who is seven, says he is nice, but she likes her daddy better.

Mrs. Traeger stated that when she and the children lived together, they had loved her; there was a nice relationship; they had been a normal family group. However, since the separation, the children were embittered against her by their father. The children, however, indicated that their father had done nothing to turn them against petitioner.

If these children do not have the love for their mother which she feels they should have, she is to blame. When they lived together, she did not share holidays and vacations with them as their father did. She was rarely at home, was out at night and did not get home until late. Their father, on the other hand, was their constant companion. Where he went, they went.

Secondly, the children resent the fact that their mother left them. Jody Marion, a close friend of Mrs. Traeger's in former days, is called Aunt Jo by the children. She is Susan's godmother and close to both the boys and the girls. She testified about the break-up of the family: ". . . the children came out to my house. Mr. Ritting had brought them there. I know it was hard for him, but he brought them there. All the children said to me, 'Aunt Jo, all we want is our mother back.' They put their arms around me and begged me to go get their mother. I had promised them I would do everything I could to get their mother back to them. The next day I called where she worked and I left the message. She did not answer my phone. . . . Richard was 16 at that time, and he told me that he had gotten down on his knees and begged his mother to stay, and Susie did too."

Richard stated that he had no affection for his mother ". . . because she just went up and left us . . . we had affections for our mother all the way up to divorce time. We begged her to come back." Richard recounted how his father ". . . made a fool of himself, I think, sometimes, getting on his knees and crying to her to come on back. And this was in the street, he did that in the street." Debbie, who is not quite 12, said that she did not want to see her mother "because she ran out on us. . . . she won't come back to us. We asked her and we begged her and she wouldn't come back."

We agree with what President Judge G. Thomas Gates, of Lebanon County, recently said:

"Children are a trust with a prior claim on parents, even before the claims of their own personal liberty. The husband or wife who puts personal happiness before the need of his family for stability is denying the true claims of his or her responsibilities and the just balance of the purposes for which marriage and

the home were created. There is no God-given 'right to happiness' which can override the profound claims of children to a stable and independent home": Commonwealth ex rel. Bordlemay v. Bordlemay, 31 D. & C. 2d 46, 49 (1963). See also Commonwealth ex rel. Schmidt v. Schmidt, 8 Bucks 180, 181 (1958).

For reasons not stated but which clearly appear, petitioner took her Cadillac and her clothes, left her children and has made a new life for herself. She has made her adjustment, and now, like a puppeteer returning to the stage, she wants us to place in her hands the threads that direct the lives of her children. During her absence, however, the children have also made adjustments.

These children are perceptive. They know their mother can do much for them; neatly groom their hair and iron their dresses, give them vacations at the shore, free them from housework, give them a new home in Cherry Hill, and provide them with the niceties that "twenty-five plus" will buy. Apparently, the only thing their father can offer is himself, his interest, his devotion, his companionship and his sense of spiritual values.

These are practical times. The advantages of cash, clothes and Cadillacs are so evident, the freedom from household drudgery so attractive, and the appeal of pretty baubles so enticing that the desire of these youngsters to stay with their father is a little perplexing. If, however, these unrealistic, foolish, short-sighted, wonderful children have made the wrong choice, someone else will have to instruct them upon the error of their ways.