## Hampton Minors

*Rudolph Wertime,* for petitioner.

*Black and Davison* and *Kenneth Lee,* for respondents.

DePuy, P. J., August 10, 1963.—On March 7, 1963, Clair E. Hampton, father of the above-mentioned minor children, filed his petition alleging that he and his former wife were divorced, that their two children were then living at the home of maternal grandparents, Mr. ‎and Mrs. Vernon C. Buterbaugh, in this county, that petitioner had been providing support for the children, that the maternal grandparents had on a number of occasions denied petitioner temporary custody of his children, that petitioner remarried on May 30, 1959, and has established a home in the general neighborhood where the said grandparents reside, which is suitable for the children, and that petitioner is entitled to have their primary custody.

The maternal grandparents, Buterbaughs, filed an answer in which they admitted that the father has been paying $7.50 a week for support of each child but asserting that the actual cost of raising the children is much greater and much of it has been supplied by the said grandparents and by the children's mother, that the father's support, as contributed, amounts to less

than one-half the actual cost of rearing the said children, and that until about February 12, 1963, petitioner had displayed little interest in having custody of the children except for occasional visits. Respondents (Buterbaughs) demanded proof of petitioner's other averments and asserted that the best interest of the children would be served by their continuing to remain in the primary custody of their maternal grandparents.

Hearings were held in the matter on April 1, 1963, and May 6, 1963. The children were interrogated at chambers in the presence of the respective counsel on June 12, 1963.

### Summary of Findings of Fact

Petitioner married in 1950 and lived with his wife, the mother of the children, until she left him in 1957. The children, born in 1952 and 1954, and aged 8 and 10 years at the time of the hearing, have from birth spent a great deal of time with their grandparents, and from 1957 have resided with them.

Petitioner remarried in 1959 after his divorce, and resides with his wife in a home purchased by them. Petitioner has visited the children from time to time, and since 1957 has paid $15 per week for their rent and support as well as medical and dental expenses.

Petitioner made no demand for the custody of his children from 1959 to 1963 for the stated reason that finances needed to remodel and furnish their home and the costs of an automobile did not permit it. Petitioner and his wife are both employed, and she expects to continue her employment, apart from her plan to be furloughed from her employment during the summer months if the children are placed in her home.

### Discussion

The prime rule by which all child custody cases must be determined is the best interest of the child. The accumulated cases contain other rules, subordinate to

this, that a court should apply when appropriate. In the application of them lies the great problem.

It is said that where a parent is a contestant, prima facie the best interest of the child is served by having the child with its own parent. This rule is based logically upon the experience of mankind that blood is thicker than water and that a natural parent will normally expend greater effort and sacrifice on behalf of a child than will a third party, especially when the going gets rough in times of economic, medical or other difficulty.

But the presumptive right of the natural parent can and should yield in the face of enough substantial evidence pointing in a different direction. There are cases where the facts show that the mere ties of blood have not produced the most assiduous kind of child rearing, and where, during a parental lapse for a substantial period of time, other persons, whether relatives or not, have demonstrated conclusively their own deep interest in and determination to provide in all respects for the welfare and development of the particular child, and where the child has developed profound emotional ties to the parent substitutes which it would be excessively traumatic and damaging to break.

As pointed out in the briefs of counsel, we are dealing with a different situation here from that in the law of bailment of inanimate objects. When one places a child in a certain environment, the actual and legal incidents created are different from those when one stores furniture in a warehouse, for example. In the latter case, the owner may return years later for his goods and, if heat, cold and moisture have not taken their toll, and if mice have been kept away, the furniture may easily be restored to him in about the same condition as when the bailment occurred.

In the case of a child, we have an emotional reaching out, the imperceptible formation of attachments which

become ever deeper with the passage of time, projected from both the child and the foster parents. The child's relation with its own parent or parents will become increasingly attenuated and distant if this is permitted to happen. A court must give recognition to these known, even though intangible, facts if it is to decide properly a case of child custody. Application of the law of bailment is not enough, whether one looks at the terms whereby the child was originally placed in the foster home situation, or at the relationship with its variety of incidents that has developed over the years.

Obviously, the law does not recognize anything resembling a contract by adults over the custody of a child that would be binding on a court in later review of the problem.

A good many cases can be found in the books where a single parent or both parents have, after a lapse of time away from the child, brought suit to recover custody of a child. The parent is entitled to the presumption in favor of natural parents. But there is a critical facet of the problem which we think has not always received careful attention when the presumptive right of the natural parent was under consideration. This facet is presented when the contest is not between natural parents on the one hand and foster parents or grandparents on the other, but where the contest is between one natural parent (who has taken a new spouse) on the one hand, and the people who for a comparatively long time, have performed with energy and love the task of actually rearing the child.

Alongside the presumptive "right" of the *one* natural parent, a court should give ample attention to the other side of the coin represented by the new stepparent who is to be thrust upon the child willynilly as a new father or mother. History, literature and common experience record the fact that many children, both in the situation where the stepparent exerts every reasonable effort to

ingratiate himself carefully upon the personality and emotional life of the child, and, on the contrary, where the stepparent has not had either the inclination or the skill to step gracefully into the shoes of the absent natural mother or father, suffer grave personality distortions that have affected permanently their mental health, personality, character and career.

Ought not a court, when confronting this kind of problem, one implicit in the set of facts before us, have regard for fairness to the children and, considering the question in its full orbit, give attention not only to the presumptive natural right of the natural parent (in this case the father), but also give attention to the *child's* right not to be reared by some other "mother" thrust upon him as a stepparent when he, himself, may prefer to retain the image of his natural mother. The child may not be desirous of accepting as mother a stranger chosen arbitrarily by her father. In short, does a child have the right to be reared by his own parent, and if this proves impossible, then to be reared by the person he has long known and loved in the substitute role of parent, rather than by a stranger chosen by his divorced or widowed father or mother?

On the facts here, we have two homes offered respectively by petitioner-father and by respondent-grandparents, homes which in physical aspects are unobjectionable, and homes that in the intangible aspects of child rearing fall clearly within the acceptable range of devotion, effort and acceptability.

The grandparents' position is that the children have, as a factual matter, been in large part reared by them almost since birth, both before and after the parents parted, that the children are habituated in the Buterbaugh home to the routine of life and love in their multiple aspects, and that the children ought not, except for the most salient reasons, and having in mind the fact of their own expressed aversion to exchanging

homes, be uprooted (even though they would still be residing in the same general neighborhood).

We would be ignoring important principles of psychology and of emotional development were we to minimize the risk involved in shifting children from a surrounding and from "parents" with which they feel at home to another residence where they do not and possibly never will feel at home. Admittedly, if we are lucky, time and adaptability may work the necessary changes in the children's habits, attitudes and affections, were they to be placed in the Hampton home, depending in part upon the skill and time devoted by Mr. and Mrs. Hampton to the problem. But is it fair or sensible to take the chance? Should the court supplant a stable and favorable situation with a wholly unpredictable and problematical one?

Be it noted parenthetically that although we have said the physical and intangible assets of each of the two homes are substantial, neither home is regarded as perfect. Considering the imperfections of life, it is not likely to be.

It was suggested by Mr. Hampton that Mrs. Buterbaugh is a person of fixed attitudes in religion and otherwise, has a strong determination in having her own way, and made some endeavor to wean the children's affections away from their father (a course which, if true, can only be condemned.)

The effort of petitioner-father on the witness stand to cast reflections upon the Buterbaugh home in certain respects is not well taken in light of the fact that he lived there for some period himself, even after his wife had left him, enjoyed the hospitality of that roof, and was satisfied to leave his children there a great deal before he and his wife parted and for a long period thereafter, all of which militate in a degree against his negative comments today about the nature of this home.

The Hampton children stated that when visiting the Hampton home Sundays under our temporary order, that Mrs. Buterbaugh gave them candy to take along, supposedly because they had complained of not getting enough to eat at Hamptons or not getting the kind of food they prefer. This wouldn't exhibit good sense on the part of Mrs. Buterbaugh. Nor did the circumstance of her praying, according to the evidence, that harm might befall Mr. Hampton if he were to persist in his efforts to get custody of the children.

Hampton's argument undertook to throw doubt on the quality of child rearing furnished by the Buterbaugh home, on the theory that their daughter, Freda, mother of these children, proved unable to fulfill her duties as mother or wife. Freda did leave the marital home, but we cannot jump to any conclusions about the reason. Married life is an intricate web. Occurrences and attitudes, open or covert, within the Hampton house are unknown to us. The whole fault may not have been hers. Her testimony, however, that she has given the children money for bringing good reports home from school does not indicate good judgment.

On the other hand, it was suggested that the children, apart from their stated unwillingness to go with the Hamptons, would not have the care there which they should because Mrs. Hampton expects to continue her employment, especially during the school year, that Mr. Hampton is addicted to sports and will be away a good many of the evenings, that he and his present wife are actuated by a different system of priorities and values from what they desired to exhibit to the court, when one takes note of the long period of time that they permitted the children's roots to become ever stronger at the Buterbaugh home while the Hamptons were improving their dwelling and purchasing an expensive automobile.

The rule of law as to estoppel of the father in certain circumstances from asserting his natural right as parent has been stated by the courts. Though this principle has not been termed laches, it partakes in a degree of the philosophy behind this equitable doctrine. In Commonwealth ex rel. Children's Aid Society v. Gard, 362 Pa. 85, 94, Chief Justice Maxey quoted a statement of Chief Justice Shaw of Massachusetts in Pool v. Gott, 14 Law Reporter 269, in holding that a father, by delaying his claim for repossession of the child, had:

". . . by his own acquiescence . . . allowed the affections on both sides to become engaged in a manner he could not but have anticipated, and permitted a state of things to arise, which cannot be altered without risking the happiness and interest of his child."

In Commonwealth ex rel. Benson v. Wayne County Child Welfare Service, 198 Pa. Superior Ct. 329, a father had placed his children in foster homes for more than three years prior to bringing his suit for custody. The Superior Court sent the case back to the lower court for further hearing and stated, at page 333:

"The father, having acquiesced in the rearing of the children in foster homes, must now present more impelling reasons to obtain custody of his children than would have been required of him to retain custody in the first instance. The court must now consider the effect upon the children of transferring them from the homes of foster parents to whom they have become attached."

Whatever was the orientation of the judges in this class of cases a hundred years ago, when some of the present rules of law were evolved, it is clear today by observation of judges and parents as well as specialists, that proper child rearing embraces not only the physical requirements of food, clothing, shelter and medical attention, but, in addition, requires close attention to

the psychological and emotional requirements of child growth. These child needs, unattended to, can and frequently do produce all the character distortion, delinquency, mental illness, poor marriages and crime which are a dominant feature of 20th-Century American life.

Hence, a competent court is obliged to give important weight to the factors of love, consistency, application, teaching, religious and spiritual development by precept and example, and a multitude of other intangible aspects of child rearing that were not formerly so clearly articulated in pediatrics and other professions as is now the case. Knowledge of these factors, either met or absent in the rearing of a particular child, explains a great many of today's grave problems in the way of a child's rejection of education, his incapacity later to form solid marital ties, development of delinquency, the filling of our mental hospitals, and other vast public ills costly both in human values and in the taxpayers' dollar.

The rule applicable here is well stated in Commonwealth ex rel. Shamenek v. Allen, 179 Pa. Superior Ct. 169, where a father had left his child with foster parents for five years before seeking full custody. The Superior Court at page 177 stated:

"A reading of the entire record convinces us that it would be cruel to force this child to go with her father at this particular time. She has been away from him for five years and she has been happy, well cared for and has developed into an exceptionally well adjusted and emotionally stable child. She loves the Allens as much as any child could love its own father and mother. She loves her school and her church and she has acquired many friends in her present environment. The great progress which has been attained in the development of this child is an existing fact which might be lost by a new experiment.

"To gamble with the future welfare and happiness of a child who has been the victim of a broken home would be cruel and unwise."

In the present argument, counsel for the father has undertaken to differentiate the Shamenek case on its facts, arguing that there the natural father's rights were viewed doubtfully by the court because of the evidence that he had earlier mistreated the 12-year-old child and the mother, leaving the child with bad memories of home life, along with a difference of religion in the family. However that may be, the court's analysis seems to express carefully the correct rule where a parent has for a long period permitted a child to remain in the custody of others and then seeks to tear the child loose from surroundings and persons it has grown to love. Admittedly, the length of time when the child has been permitted to remain away from the natural parent in the Hampton case is not as long as in some of the cases cited, but the principle is the same.

In the present case, the Buterbaughs assumed an important role as parent substitutes considerably before the break-up of the Hampton marriage and have been full-time parent substitutes for four years afterwards. Mrs. Buterbaugh has applied herself assiduously in all respects to the duties of mother of these children, and they regard the Buterbaughs as their de facto parents. Since babyhood the children have known no other home. To tear a child from such a home, even for the purpose of placing it, not with biological parents, but with one biological parent, would surely be risking the known for the unknown, stability for uncertainty, in the life of these children. On facts such as here presented, ought not the emphasis on blood ties yield to emphasis on ties of love (still within the family circle) nurtured through long environment?

Cases in support of the foregoing view are: Commonwealth ex rel. Kraus v. Kraus, 185 Pa. Superior Ct.

167; Commonwealth ex rel. Bendrick v. White, 403 Pa. 55; Commonwealth ex rel. Kuntz v. Stackhouse, 176 Pa. Superior Ct. 361, 363, 364; Commonwealth ex rel. Piper v. Edberg, 346 Pa. 512, 515; Commonwealth ex rel. Bailey v. Sumner, 193 Pa. Superior Ct. 79.

The prime reliance of petitioner's argument is upon his blood tie to the children as father. But we must remember that his wife has no blood tie to the children at all, which reduces the equation by 50 percent, whereas the Buterbaughs do have the blood tie of grandparents.

In Commonwealth ex rel. Kuntz v. Stackhouse, 176 Pa. Superior Ct. 361, the Superior Court denied a grandparents' claim for custody based solely on blood, saying at page 367:

" ' "To remove a child from a home, with all of its advantages, in which he has lived for years, and from the wholesome environment to which he has made a complete adjustment, could not be done in the interests of the child." ' "

A reading of the custody cases tends at times to raise the suspicion that some courts, while using the language of serving the best interest of the child, have looked principally at the interests and demands ("rights") of the biological parents. They have not always looked at the problem through the eyes of the child, in an effort to appreciate the child's cares, wants and needs. The important study by Dr. John Bowlby, famous English child psychiatrist, "Maternal Care and Mental Health" (World Health Organization, 1952) supports the view that the early years of child rearing are critical, that attachments of the utmost importance to the later adulthood of the child are formed during this period, and cannot be torn apart and reconstituted with impunity. (pages 51, 53, 67, 71.)

Our Superior Court emphasized this point recently in Commonwealth ex rel. Doberstein v. Doberstein, 201

Pa. Superior Ct. 102, when it quoted from Commonwealth ex rel. Dinsmore v. Dinsmore, 198 Pa. Superior Ct. 480:

" 'In determining the custody of children the paramount question to which all other recognized policies of the law as to custody, including the above, are subordinated, is the welfare of the children. "It is basic and fundamental that the paramount consideration is the welfare of the children and that all other considerations, including the rights of parents, are subordinate to the children's physical, intellectual, moral, spiritual and emotional well being." Com. ex rel. McNamee v. Jackson, 183 Pa. Super. 522, 525, 132 A. 2nd 396 (1957).' "

Two school teachers who have had the Hampton children in class at the Montgomery Township School testified in support of the quality of rearing furnished by the Buterbaughs. One of the teachers stated,

". . . I will say the children talk about their grandparents and they have the feeling for their grandparents that they should have for parents."

In Commonwealth ex rel. Bradley v. Bradley, 188 Pa. Superior Ct. 108, the Superior Court affirmed an order awarding custody to foster parents, where the contest involved a remarried father, a remarried mother and paternal grandparents. The court quoted President Judge Henninger:

" 'The Gordon Bradleys and the Trainers stand, therefore, upon an equal footing before this Court. Other things being equal, we would still be inclined to favor the blood relative. But other things are not equal. We cannot overlook the eight years of loving care, voluntarily and sacrificially bestowed on this boy by the Trainers and the resultant bond of affection between them. We cannot overlook the fact that, although it is no fault of the Bradleys, Jon is a complete stranger to them. . . . Without placing undue emphasis on Jon's

own expressed desire to remain with the Trainers, it is nevertheless an important factor psychologically in the life of a child. . . . We simply cannot hold ourselves responsible for the nervous shock this child would inevitably suffer if he were forcibly removed from the home of the only mother and father he has ever known.' "

In Commonwealth ex rel. Oliver v. Oliver, 165 Pa. Superior Ct. 593, 596, a mother sought custody from the father, and members of the mother's household (like petitioner's wife in the present case) were strangers to the child. The court said:

"The established facts show their present situation is one conducive to a normal development while the proposed change of abode will thrust the children into a new and strange environment and require many untested adjustments. Nothing can be gained by such a change at this time and much might be lost by so doing. . . . To remove children from one home to another is always attended by shock and should be avoided if possible. Their bonds of affection may become so strong that to sunder them suddenly may result not only in the children's unhappiness, but also in their physical injury."

The rule that we think determines the present case is stated by Chief Justice Maxey in the Children's Aid Society case (362 Pa. 85), where he quotes from Mr. Justice Brewer of the United States Supreme Court, when that judge was on the Kansas Supreme Court, in the case of Chapsky v. Wood, 26 Kan. 650, 40 Amer. Reports 321. There a father when poor had given his child to his wife's sister for five and a half years and then, having acquired money, sought custody. The Supreme Court of Kansas refused to change custody, saying:

" 'The father is the natural guardian and is prima facie entitled to the custody of his minor child. This

right springs from two sources: one is, that he who brings a child, a helpless being, into life, ought to take care of that child until it is able to take care of itself; and because of this obligation to take care of and support this helpless being arises a reciprocal right to the custody and care of the offspring whom he must support; and the other reason is, that it is a law of nature that the affection which springs from such a relation as that is stronger and more potent than any which springs from any other human relation. The second proposition of law is, that a child is not in any sense like a horse or any other chattel, subject-matter for absolute and irrevocable gift or contract. . . . In this it differs from the gift of any article which is only property. . . . The third proposition is, that a parent's right to the custody of a child is not like the right of property, an absolute and uncontrollable right. If it were, it would end this case and relieve us from all future difficulties. A mere right of property may be asserted by any man, no matter how bad, immoral, or unworthy he may be; but no case can be found in which the courts have given to the father who was a drunkard and a man of gross immoralities, the custody of a minor child, especially when that child is a girl. The fact that in such cases the courts have always refused the father the custody of his child, shows that he has not an absolute and uncontrollable right thereto. The fourth proposition is, that though the gift of the child be revocable, yet when the gift has been once made and the child has been left for years in the care and custody of others, who have discharged all the obligations of support and care which naturally rest upon the parent, then, whether the courts will enforce the father's right to the custody of the child, will depend mainly upon the question whether such custody will promote the welfare and interest of such child. This distinction must be recognized . . . ties of blood weaken, and ties of

companionship strengthen, by lapse of time. . . . The fifth proposition is, that in questions of this kind three interests should be considered: The right of the father must be considered; the right of the one who has filled the parental place for years should be considered. Perhaps it may not be technically correct to speak of that as a right; and yet, they who have for years filled the place of the parent, have discharged all the obligations of care and support, and especially when they have discharged these duties during those years of infancy when the burden is especially heavy, when the labor and care are of a kind whose value cannot be expressed in money—when all these labors have been performed and the child has bloomed into bright and happy girlhood, it is but fair and proper that their previous faithfulness, and the interest and affection which these labors have created in them, should be respected. Above all things, the paramount consideration, is what will promote the welfare of the child?' "

Mr. Justice Maxey, at page 97, described the harmful result of tearing a child from foster parents he has grown to love:

"A child of two years of age or under will form new attachments quickly if treated kindly by those into whose care it is given. In that respect it resembles a young tree whose roots have not yet taken deep hold in the nourishing earth, but when a child is much beyond the age of two years, it becomes strongly attached to those who stand in parental relationship to it and who have tenderly cared for it. Its bonds of affection have become so strong that to sunder them suddenly may result not only in the child's unhappiness, but also in its physical injury. Even dogs which have been separated from masters to whom they are attached have been known to go into physical decline and sometimes to die as a result of that separation. To take this nearly 65 months old girl, Betty Jean Tuttle, away

from the only parents she has known since she was an infant of eighteen months would be exactly the same in its effect on her and on the man and woman who have stood in a parental relationship to her for nearly four years as would the separation of any well cared for child from its own parents. Nothing could be more cruel than the forceable separation of a child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection; to a child it is equally cruel whether the separation is brought about by 'kidnapping' or by legal process. In passing on the contested custody of children no judge can do justice without considering the human aspect of his problem."

We do not think that the cases cited on behalf of petitioner, viewed on their facts, are contrary to the foregoing.

Petitioner cites the Act of June 26, 1895, P. L. 316, 48 PS §92, which does not give any particular aid in the present problem. The statute provides:

". . . in all cases of dispute between the father and mother of such minor child, as to which parent shall be entitled to its custody or services, the judges of the courts shall decide, in their sound discretion, as to which parent, if either, the custody of such minor child shall be committed, and shall remand such child accordingly, regard first being had to the fitness of such parent and the best interest and permanent welfare of said child."

Where grandparents are involved in a custody suit, an argument is sometimes made, because of their age, against their having custody. The Buterbaugh ages are 50 and 48 and they appear in the full vigor of health. The problem was dealt with in Commonwealth ex rel. Graham v. Graham, 367 Pa. 553, involving a 78-year-old great-grandfather, where the court said:

"The affection of a grandparent can safely be said to be no less in depth than parental affection which, as stated in 14 Ruling Case Law, Page 271, Par. 44, 'is not only entitled to consideration as constituting a strong claim on behalf of the parents but as an element of priceless advantage to the infant.' "

To the same effect are Commonwealth ex rel. Stevens v. Shannon, 107 Pa. Superior Ct. 557, 565; Commonwealth ex rel. Bendrick v. White, 403 Pa. 55, and Commonwealth ex rel. Kraus v. Kraus, 185 Pa. Superior Ct. 167.

The current of modern thinking in these matters is reflected in section 702 of the proposed Marriage Code recently drafted by the Joint State Government Commission and to be presented to the next legislature. The section provides:

"Wherever there is at issue a dispute as to the custody of a minor child, whether between father and mother or otherwise, the court shall award such custody to a fit and proper person according to the best interests of the child. Custody may be awarded to persons other than the father or mother whenever such an award serves the best interests of the child, and any person who has had de facto custody of any child in a wholesome home and is a fit and proper person shall prima facie be entitled to an award of custody. Where the child has sufficient capacity to reason, his wishes as to custody shall be given due weight by the court and shall be respected if his preference is a fit and proper person. . . . The court may also hear the testimony of any expert produced by any party or upon its own motion, whose skill, insight and experience is such that such testimony is relevant to a just determination of what is to the best spiritual, mental, physical, emotional, and social interests of the child whose custody is at issue . . ."

The testimony of Hampton, taken in relation to all the other evidence, exhibits a number of inconsistencies and inaccuracies which give reason for some doubt as to the weight to be given to all parts of his testimony, as to the appraisal we are required to make of his intentions concerning the children, and our evaluation of the long period in which he has left them with the Buterbaughs. We are not convinced he made a sufficiently early or determined effort to expend time and care upon his children, though he did later make regular payments for their support.

That Hampton did in the first instance make any agreement, tacit or otherwise, with Buterbaughs that the children should remain permanently with them, we are not convinced. In any case, such an agreement would lack legal force inasmuch as the care of children is always subject to judicial examination anew in light of finding the best interest of the child on the current facts. It is not unlikely that the Buterbaughs, particularly Mrs. Buterbaugh, having expended much love and care, and having formed a great attachment for the children, were reluctant on later occasions that Mr. Hampton asked for temporary custody to let him have them, thinking, rightly or not, that he might not return them.

Knowing the feelings of a true mother or foster mother, we do not rush to condemn Mrs. Buterbaugh for this attitude, though, in the interest of sound emotional health of adults or children, it is not one that we encourage. Her attitude is explainable if not excusable.

The wishes of the children themselves are of interest to the court, though certainly they are not controlling, especially with children of this age. However, the children plainly stated their desire to remain with the Buterbaughs and their opposition to being placed with the Hamptons.

Upon placing primary custody of the children with the Buterbaughs, it is the court's duty to make certain that the latter effectively assist the children in possessing a wholesome and proper attitude toward their father and a willingness to visit him on a proper schedule of visits. It would be proper, we think, to terminate any responsibility for payment of support by Hampton to the Buterbaughs, though any gifts by him to the children or to their bank or education accounts would be entirely in order.

Now, August 10, 1963, the petition of Clair E. Hampton, father, is denied. Primary custody of the children, Cindy Lou Hampton and Carol Lee Hampton, is placed with their grandparents, Vernon C. Buterbaugh and his wife, Thelma Buterbaugh. Counsel for the respective parties will, unless the parties prefer to make amicable and oral arrangements, submit to the court for signature an order providing for the father to have temporary custody at proper times, not oftener than once every two weeks or, perhaps, once a month. Exception granted to petitioner. Costs are placed upon the Buterbaughs.